## MATTER OF BLAS

### In Deportation Proceedings

### A-18487421

*Decided by Board August 2, 1974 and October 31, 1974*
*Decided by Attorney General March 10, 1976*

(1) Although family ties will ordinarily result in favorable exercise of administrative discretion under section 245 of the Immigration and Nationality Act, they neither must nor should do so where it appears that the alien has engaged in a course of deception designed to produce those very ties.

(2) Where respondent in application for nonimmigrant visitor's visa made misleading and incomplete statements to the consular officer concerning his intentions in coming to the United States, the whereabouts of his parents and the nature of his employment in the Philippines, even though such misrepresentations did not amount to fraud or misrepresentation within the meaning of section 212(a)(19) of the Act (*Matter of S— and B— C—*, 9 I. & N. Dec. 436 (A.G. 1961)), relief under section 245 was denied notwithstanding the fact that respondent has a U.S. citizen spouse, because such equity does not overcome the adverse impact of respondent's misrepresentations in applying for entry into the United States.

(3) *Matter of Arai*, 13 I. & N. Dec. 494 (BIA 1970) reaffirmed.

CHARGE:

Order: Act of 1952—Section 241(a)(2) [8 U.S.C. 1251(a)(2)]—Nonimmigrant visitor—
remained longer than permitted

ON BEHALF OF RESPONDENT:
John M. Weir, Esquire
483 Castro Street
San Francisco, California 94114

ON BEHALF OF SERVICE:
Sam Bernsen
General Counsel

Paul C. Vincent
Appellate Trial Attorney

## BEFORE THE BOARD
(August 2, 1974)

On April 18, 1973, an immigration judge found the respondent deportable as charged, granted him the privilege of voluntary departure, ordered his deportation to the Republic of the Philippines, in the event of his failure to depart when and as required, denied his application for permanent residence status under section 245 of the Immigration and Nationality Act, in the exercise of administrative discretion,

and certified the case to us for final decision. The immigration judge's decision will be affirmed.

The respondent, a 38-year-old male native and citizen of the Philippines, was admitted to the United States at Honolulu, Hawaii, as a visitor, on or about September 21, 1970. On November 13, 1972, he was granted the privilege of departing voluntarily from the United States on or before November 28, 1972, without the issuance of an order to show cause. He failed to depart within the specified time. His deportability under section 241(a)(2) of the Immigration and Nationality Act has been established by clear, convincing, and unequivocal evidence.

On March 18, 1973, the respondent married a woman who obtained United States citizenship a month later, and who, thereafter, filed a visa petition to accord him immediate relative status. That petition was approved.

At the hearing before the immigration judge, the respondent applied for adjustment of his status to that of a permanent resident, under section 245 of the Immigration and Nationality Act. The immigration judge denied that relief in the exercise of administrative discretion, but granted the respondent's alternative application for the privilege of voluntary departure.

The respondent was adopted by a couple when he was only one and a half years old (Tr., p. 23). His adoptive parents have resided in the United States for many years (Tr., p. 22). They are United States citizens. In his correspondence with them, he discussed with them the matter of a visa petition to be filed by them on his behalf after his entry into the United States (Tr., p. 22). When he filed his nonimmigrant visa application with the American Consul in Manila he disclosed none of the foregoing facts. On the contrary, he stated in his application that neither of his parents was in the United States, and that he planned to stay in the United States for 35 days. For the benefit of the American Consul he described himself as a "supervisor" with Star-Lite Philippines, Inc. (Exhibit 3, Visa Application, Form FS-257a). Actually, he was doing some contract work for that company (Tr. p. 27) after a regular eight-hour working day with the Mitsui Corporation which employed him as a draftsman (Tr., p. 25).

The record further shows that the respondent came to the United States from the Philippines to get away from his family, that is, from his wife and their four minor children (Tr., p. 18). He came here with the intention to divorce his wife (Tr., p. 19), to remarry in the United States (Tr., p. 19), and to stay here. When he applied for his nonimmigrant visa with the American Consul he stated that his purpose was to take a "pleasure trip" (Exhibit 3, Form FS-257a). He did not reveal his true plans.

The respondent's adoptive parents filed a fourth-preference visa peti-

tion for him. However, during the times here pertinent, no visa numbers were available for natives of the Philippines who were within the fourth-preference class. Eventually, the respondent's adoptive parents withdrew the visa petition which they had filed on his behalf (Tr., p. 21). They have had no contacts with him for at least a year (Tr., p. 11).

The respondent has managed to carry out his preconceived plans. He went to Nevada for two months (Tr., p. 16), secured a divorce from his wife, who was, and still is, in the Philippines, and married his present wife, who was then a lawful permanent resident of the United States. The immigration judge is convinced that that kind of conduct should preclude the granting of adjustment of status. Not finding any unusual and appealing circumstances present, he denied the application for section 245 relief. We fully agree.

We are quite aware of the difficulties which confront immigration judges in matters of this kind. As in all other matters which involve the exercise of administrative discretion, the immigration judge's decision will depend, and must be based, on the facts of the particular case. In voicing his concern, this immigration judge has added that the respondent's case is one of many in which aliens are proceeding in a similar fashion, abandoning their families and causing tribulations to their dependents. While the facts of record amply support the denial of this respondent's application for section 245 relief, we emphasize that no decision should ever rest, or even give the slightest appearance of resting, upon generalizations derived from evaluations of the actions of members of any group of aliens. Every adjudication must be on a case-by-case basis. Were we to promulgate overly strict guidelines, we would, in effect, infringe upon the immigration judge's discretionary authority. Thus, the guidelines which we adopted have of necessity been general, and not specific.

In *Matter of Ortiz-Prieto*, 11 I. & N. Dec. 317 (BIA 1965), we emphasized that:

". . . the applicable statute does not contemplate that all aliens who meet the required legal standards will be granted adjustment of status to that of a permanent resident since the grant of an application for adjustment of status is a matter of discretion and of administrative grace, not mere eligibility; discretion must be exercised by the Attorney General even though statutory prerequisites have been met."

In *Matter of Arai*, 13 I. & N. Dec. 494 (BIA 1970), we attempted to clarify the language which we had used in *Ortiz-Prieto*, supra. We stated the following:

"It is difficult and probably inadvisable to set up restrictive guide lines for the exercise of discretion. Problems which may arise in applications for adjustment must of necessity be resolved on an individual basis. Where adverse factors are present in a given application, it may be necessary for the applicant to offset these by a showing of unusual or even outstanding equities. Generally, favorable factors such as family ties, hardship,

length of residence in the United States, etc., will be considered as countervailing factors meriting favorable exercise of administrative discretion. In the absence of adverse factors, adjustment will ordinarily be granted, still as a matter of discretion."

It appears that there is a need for further clarification.

Whenever an alien applies for discretionary relief in immigration matters, he bears the burden of showing why administrative discretion should be favorably exercised. Thus, an alien who, at a hearing held before an immigration judge, applies for adjustment of his status to that of a lawful permanent resident, has the burden of establishing that the requested relief should be granted in the exercise of discretion, 8 CFR 242.17(d); *Chen* v. *Foley*, 385 F.2d 929 (C.A. 6, 1967), cert. denied 393 U.S. 838; *Thomaidis* v. INS, 431 F.2d 711 (C.A. 9, 1970), cert. denied 401 U.S. 954; *Matter of Ortiz-Prieto*, supra.

Where an alien and the alien's spouse have been living apart for many years, the marriage has existed in name only, the alien visits in the United States, enters into a bona fide marriage with an American citizen or lawful permanent resident after a divorce from the foreign spouse, and becomes the beneficiary of an approved visa petition, and there are no adverse factors present, the alien's application for adjustment of status is not likely to present any problems. However, those are not the facts in the case that is now before us. Here the respondent's scheme precludes the favorable exercise of administrative discretion. The provisions of the Immigration and Nationality Act are supposed to favor the reuniting of families. It would be unreasonable to ascribe to Congress an intention to promote the breakup of aliens' marriages abroad. We reject, as erroneous, any interpretation of the *Arai* standards which would require a grant of adjustment of status in every case in which the alien has succeeded in negotiating a marriage to a United States citizen or to a lawful permanent resident alien. Specifically, we emphasize that immigration judges are not required to disregard the abandonment of an alien's spouse and children in every case in which the alien has, in this country, divorced the spouse, and has remarried here. Remarriage in this country does not excuse all else. *Matter of Tayeb*, 12 I. & N. Dec. 739 (BIA 1968).

Even the privilege of voluntary departure is not to be had for the mere asking. Under the provisions of section 244(e) of the Immigration and Nationality Act, an alien who applies for that privilege has to "establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least five years immediately preceding his application for voluntary departure under this subsection." In *Matter of Gamboa*, 14 I. & N. Dec. 244 (BIA 1972), we mentioned a few of the factors which will be considered when an application for the privilege of voluntary departure has been made. Adjustment of status is a much higher form of discretionary relief than a grant

of voluntary departure. While the provisions of section 245 of the Act, unlike those of section 244(e), do not specifically require that the alien have been a person of good moral character during a certain period of time, an alien's good moral character or lack thereof is an important factor.

Adjustment of status under section 245 of the Act was not designed to supersede the regular consular visa-issuing processes or to be granted in non-meritorious cases. *Chen* v. *Foley*, supra. An applicant who meets the objective prerequisites for adjustment of status is in no way entitled to that relief. *Jarecha* v. *INS*, 417 F.2d 220 (C.A. 5, 1969). That relief is extraordinary inasmuch as it dispenses with ordinary immigration procedures. *Chen* v. *Foley*, supra. We therefore held in *Matter of Ortiz-Prieto*, supra, and affirm, that the extraordinary discretionary relief provided in section 245 of the Act can only be granted in meritorious cases, and that the burden is always upon the alien to establish that his application for that relief merits favorable consideration. See also *Santos* v. *INS*, 375 F.2d 262 (C.A. 9, 1967); *Diric* v. *INS*, 400 F.2d 658 (C.A. 9, 1968), cert. denied 394 U.S. 1015.

In *Matter of Arai*, supra, at page 496, we had stated the following: "In the absence of adverse factors, adjustment will ordinarily be granted, still as a matter of discretion." That statement should not be misinterpreted as implying that adjustment of status must be granted in the absence of major adverse factors, or that the Service has the burden of showing that the alien is not entitled to adjustment of status. Adjustment of status pursuant to section 245 of the Immigration and Nationality Act may be granted where the alien has established that favorable exercise of discretion is warranted.

The immigration judge's decision was correct. It will be affirmed.

**ORDER:** The decision of the immigration judge denying the respondent's application for permanent resident status under section 245 of the Immigration and Nationality Act is affirmed.

*Further order:* Pursuant to the immigration judge's order, the respondent is permitted to depart from the United States voluntarily without expense to the Government within 30 days from the date of this order or any extension beyond that time as may be granted by the district director, and under such conditions as the district director shall direct.

*Further order:* In the event of the respondent's failure to depart when and as required, the privilege of voluntary departure shall be withdrawn without further notice or proceedings, and the following order shall thereupon become immediately effective: the respondent shall be deported from the United States to the Republic of the Philippines on the charge contained in the order to show cause.

**Maurice A. Roberts, Chairman, Dissenting:**

I respectfully dissent from the decision of the majority. In the guise of "clarification", the Board today recedes from the general (and, in my view, realistic) criteria laid down in *Matter of Arai*, 13 I. & N. Dec. 494 (BIA 1970). In doing so, it opens the door to the vague standards which prevailed in our pre-*Arai* formulations. In my estimation, denial of section 245 adjustment is not warranted on this record, either on the basis articulated by the immigration judge or on the somewhat different rationale advanced by the majority of this Board.

The respondent is a 40-year-old, married male alien, a native and citizen of the Philippines, who was admitted to the United States as a nonimmigrant visitor on or about September 21, 1970 and remained longer than permitted. He left behind in the Philippines his wife and four minor children. He and his wife had had various differences and before he left the Philippines he had made up his mind to divorce her in the United States, as there is no divorce in the Philippines (Tr. pp. 11, 18, 19, 20). On arrival, he stayed with his adoptive parents, United States citizens, who had adopted him in the Philippines when he was a year and a half old. A few weeks after arrival, he met Rufina Agcaoili, a native of the Philippines, who was then a permanent resident and is now a citizen of the United States. She became his "girl friend," and after obtaining a divorce from his wife in Reno, Nevada, respondent and Rufina were married on March 18, 1973. The bona fides of that marriage is not disputed (Tr. p. 35). On the approval of Rufina's immediate relative visa petition in his behalf, the respondent became eligible for adjustment of status under section 245 of the Immigration and Nationality Act.

At the deportation hearing, respondent's deportability was not seriously disputed and he applied for section 245 adjustment. The immigration judge apparently found him to be statutorily eligible for the relief sought, but denied it in the exercise of discretion and certified his decision to the Board for review. The immigration judge apparently concluded that the respondent had had a preconceived intent to remain here when he applied for his nonimmigrant visa. This adverse factor, he concluded, was not sufficiently counterbalanced by "unusual and appealing circumstances" to warrant a grant of relief. The precise basis for his unfavorable exercise of discretion was stated as follows (opinion, pp. 2–3):

> This type of case, and there are many of them, distresses me more than any other kind I am required to hear. The word has gotten around that if an alien marries a citizen or permanent resident he can stay. Indeed, in the instant case, the respondent admitted that when he came to the United States it was with the intention of divorcing his wife and remarrying so he would not have to leave. Consequently each time I am confronted with an application for permanent residence in such a case, I feel that if I grant it, my

decision will serve to encourage other aliens to desert their families abroad and that, in part, I will be responsible. I am cognizant of the fact if an alien is forced to leave the United States, it will result in a hardship to his wife here, but I cannot overlook the tribulations to which he has subjected his overseas family.

If applications in such cases were to be denied except where there are unusual and appealing circumstances present, it might help to ameliorate the problem. However, it is not one that acting individually, I can resolve. It is more a policy question to which the Board of Immigration Appeals should address itself. Accordingly, although I shall deny the application because I do not find any unusual or appealing circumstances present, I shall certify the case to the Board of Immigration Appeals for final decision.

The immigration judge's failure to make specific fact findings leaves me somewhat in the dark as to just what he meant when he referred to "[t]his type of case" and "such cases", in which he believes denial of relief should be the rule. I can only infer that the immigration judge concluded that respondent's case followed the factual pattern of many other cases which he had adjudicated and which had distressed him. In those pattern cases, presumably, the alien without justification disrupted an otherwise viable marriage and deserted his wife and children in the Philippines with the intent of coming to the United States in the guise of a nonimmigrant visitor, obtaining a quick divorce here, and promptly marrying a United States citizen whose visa petition in his behalf would pave the way for section 245 adjustment. If the immigration judge thus appraised the respondent's situation, the record does not support the appraisal.

On the record, it is not at all clear that the break-up of respondent's first marriage was attributable to fault on respondent's part. The record does not clearly develop who was at fault. The respondent testified that he and his first wife had had "varying differences" and that he came to the United States "to avoid trouble with her family" (Tr. p. 11); that "she prefers to live with her parents and I don't like it so I have to leave—live away from them" (Tr. p. 18); that his relationship with his former wife in the Philippines was not very good (Tr. p. 20); that his return to her would cause him the same "mental anguish" (Tr. p. 21). Conceivably, the break-up of the marriage could have been attributable to fault on the part of respondent's wife. Conceivably, the respondent may have been fully justified as a matter of law in leaving her. Consequently, unless we are to say that it is completely immaterial that the wife may have been solely responsible for the failure of the marriage, if this question is one which is relevant in the grant or denial of discretionary relief, it should have been developed of record. Certainly, the evidence does not support a finding that the respondent without justification disrupted an otherwise viable marriage for the purpose of achieving permanent residence in the United States.

Similarly, the record does not support the notion that the respondent deserted and failed to support his children. The respondent testified

632

that he sent money periodically to his wife and children in the Philippines (Tr. pp. 13–15). The divorce decree required him to send $25 monthly for the support of each child and $50 for his first wife. He testified he complied fully (Tr. pp. 14–15) and the immigration judge did not accept the trial attorney's suggestion that respondent be required to submit cancelled checks to prove such compliance (Tr. p. 15). The immigration judge apparently concluded that discretionary denial was warranted even if respondent could prove compliance. The immigration judge justified his disregard for the hardship to respondent's citizen wife because "I cannot overlook the tribulations to which he has subjected his overseas family" (Opinion, p. 3). The record is devoid of evidence of such tribulations.

In thus making fact findings and drawing conclusions based on matters outside the administrative record, the immigration judge repeated a pattern already manifested in other cases involving Filipino applicants for section 245 adjustment. In *Matter of Salvador*, file A-17207299 (unreported), the same immigration judge stated:

"By now, everyone dealing with such matters is aware that aliens from the Philippines will engage in any fraud to get here and will do anything to stay. Attorneys have repeatedly informed me that when they are consulted by aliens who have been told to leave the United States they inform them that unless they are married to citizens or permanent residents, nothing can be done for them. The advice given by such attorneys is quite accurate and results in cases like this.

In the San Francisco district we have been inundated with cases of aliens who have obtained their visitor's visas by fraud and who have gotten married after they were told they must leave the United States. When an alien enters into a marriage forced by the knowledge that he must otherwise return to the Philippines, it may reasonably be inferred that such marriage will last only long enough for permanent resident status to be acquired. There may be a hardship to a spouse to require an alien to leave the United States in those few cases where the marriages are bona fide; but this should not be the overriding consideration. The Board of Immigration Appeals has recognized that unless there is adherence to the policy of requiring departure, effective administration of the immigration laws can be seriously impeded. *Matter of M*, 3 I. & N. Dec. 490.

The immigration laws should not be administered in such fashion as to encourage an alien to perpetuate a fraud on the Government so he can get here and then, instead of punishing him, reward him with permanent resident status. It will only assure that more and more aliens will engage in such frauds. Indeed, it has long since produced that result. The saddest of these cases are those like the instant one in which the administration of the law has caused aliens to forsake their wives and children in the Philippines."

See also *Matter of Macapinlac*, file A-18989654 (unreported), in which the same immigration judge stated:

"By now, everyone dealing with such matters is aware that aliens from the Philippines will engage in any fraud to get here and will do anything to stay. Attorneys have repeatedly informed me that when they are consulted by aliens who have been told to leave the United States they inform them that unless they are married to citizens or permanent residents, nothing can be done for them. The advice given by such attorneys is quite accurate and results in cases like this.

"In the San Francisco District we have been inundated with cases of aliens who have obtained their visitor visas by fraud and who have gotten married after they were told that they must leave the United States. When such an alien marries it is undoubtedly a continuation of the fraud and the marriage lasts only long enough for permanent resident status to be acquired. There may be a hardship to a spouse to require an alien to leave the United States in those few cases where the marriages are bona fide; but this should not be the overriding consideration. The immigration laws should not be administered in such fashion as to encourage an alien to perpetrate a fraud on the government so he can get here and then, instead of punishing him, reward him with permanent resident status. It will only insure that more and more aliens will engage in such frauds. Indeed, it has long since produced that result. The saddest of these cases are those like the instant one in which the administration of the law has caused the desertion of wives and children in the Philippines. In this case there was fraud in obtaining the visitor's visa, a wife and eight children in the Philippines were deserted, and the respondent married after he was told to leave the United States. He should be deported."

In *Mar Gong* v. *Brownell*, 209 F.2d 448 (C.A.9, 1954), in reversing a judgment and remanding for new findings, the court stated (at app. 450, 453):

"What has caused this court considerable difficulty in the application of the rule just mentioned, is the fact that the trial court in directing the preparation of findings in favor of the defendant, filed an extensive opinion which creates the impression that the findings are predicated upon considerations other than the evidence given in this particular case." (p. 450).

\* \* \* \* \*

"The situation here is in many respects similar to that which confronted us in Takehara v. Dulles, supra, in which we reversed a judgment of the trial court denying a similar application for adjudication of citizenship for the reason that we were convinced that the trial court in making its findings had done so in reliance upon considerations which in our opinion should have carried no weight in that particular case. Similarly we think that the court here should not have given weight to its experiences, unfortunate as they may have been, in other cases, in arriving at its findings with respect to the appellant. Each case should be allowed to stand upon its own bottom." (p. 453).

It seems to me that the immigration judge here, in exercising administrative discretion unfavorably to the respondent, improperly gave weight to his experiences in other cases involving Filipinos in arriving at his findings with respect to the respondent. The immigration judge's conclusion that the respondent left his wife without cause and deserted his children is not supported by the evidence of record. Reversal would be warranted on this basis even if there were no other. But there is another.

I call attention to the immigration judge's foregoing lapse, not in disparagement of the immigration judge, who is a keen observer and a good lawyer, but to underscore the need for objective standards in exercising administrative discretion. Mere eligibility for the relief sought is, of course, merely one of the elements; discretion must still be exercised. The immigration judges (and the members of this Board on

634

appeal) wield awesome power in exercising administrative discretion. Where, as here, a deportable alien is married in good faith to a United States citizen wife and is eligible to have his status adjusted so that he can remain here with her permanently, our discretionary determination can either permit them to remain united or tear them apart. There are thirty-one immigration judges throughout the United States and five members of the Board. Unless some objective standards are laid down for the exercise of administrative discretion, decisions could be based on our own unfettered and subjective notions. An intolerant immigration judge could deny relief to aliens whose cultural patterns, moral standards, or life style differed from his own. A hostile or xenophobic immigration judge could vent his spleen on aliens he personally considered offensive without articulating the actual basis for his decision. Unless standards are laid down which are not illusory and can be uniformly applied, we depart from even-handed justice and the rule of law.

The criteria which we have announced from time to time in our reported pre-*Arai* decisions have not been meaningfully adequate and have been the subject of extensive criticism. See, e.g., Sofaer, *Judicial Control of Informal Discretionary Adjudication and Enforcement*, 72 Col. L. Rev. 1293 (1972); *Ameeriar v. INS*, 438 F.2d 1028 (C.A. 3, 1971).

We held at an early date that an alien to whom a nonquota visa was available abroad and who entered as a nonimmigrant with the intention of obtaining section 245 adjustment, thereby circumventing the consular visa-issuing process, should be denied adjustment in the exercise of discretion, *Matter of Garcia-Castillo*, 10 I. & N. Dec. 516, 790 (BIA, 1964). Where the intention to remain here permanently was formulated *after* nonimmigrant entry, we authorized adjustment, *Matter of Barrios*, 10 I. & N. Dec. 172 (BIA 1963). In the face of circumvention of the consular visa-issuing process, we held that "substantial equities" should be required before discretion should be favorably exercised, *Matter of Rubio-Vargas*, 11 I. & N. Dec. 167 (BIA 1965). In *Matter of Ortiz-Prieto*, 11 I. & N. Dec. 317 (BIA 1965), we went further and sustained the denial of relief in the exercise of discretion to an eligible alien who had acted in good faith because there were no "outstanding equities" in his case. In *Matter of Leger*, 11 I. & N. Dec. 796 (BIA 1966), we stated, "There must be outstanding equities" in his case. In *Matter of Leger*, 11 I. & N. Dec. 796 (BIA 1966), we stated, "There must be outstanding equities, in a general meritorious case, to warrant [the grant of adjustment]." In *Matter of Ramirez*, 12 I. & N. Dec. 78 (BIA 1967), we held that section 245 adjustment "should only be granted in meritorious cases."

Because of growing discontent with the illusory standards theretofore

announced, a more meaningful criterion was attempted in *Matter of Arai*, 13 I. & N. Dec. 494 (BIA 1970). Clarifying and modifying the language of *Matter of Ortiz-Prieto*, supra, we set forth the following superseding guide-lines:

> "It is difficult and probably inadvisable to set up restrictive guide lines for the exercise of discretion. Problems which may arise in applications for adjustment of status must of necessity be resolved on an individual basis. Where adverse factors are present in a given application, it may be necessary for the applicant to offset those by a showing of unusual or even outstanding equities. *Generally, favorable factors such as family ties,* hardship, length of residence in the United States, etc., *will be considered as countervailing factors meriting favorable exercise of administrative discretion.* In the absence of adverse factors, adjustment will ordinarily be granted, still as a matter of discretion," (Emphasis supplied).

These standards have proved to be generally satisfactory. Most of the immigration judges have evinced little difficulty in accepting them (as they are bound to do) and in applying them. I see no sound reason to recede from those standards, in the guise of "clarifying" them, and going back to the former illustory standards. The Board today affirms (Opinion, p. 7) the *Ortiz-Prieto* holding that section 245 relief can only be granted in "meritorious" cases. A requirement that a case be "meritorious" is illusory unless the term is defined. Without further guide lines to determine which case is meritorious and which case is not, it is left to each immigration judge to make this value judgment of the basis of his own subjective notions.

Thus, one immigration judge may consider a case lacking in merit if the alien has divorced his spouse abroad, regardless of who was at fault. Another may find an absence of merit only if the break-up of the marriage was attributable to the alien applying for section 245 relief. Another may focus instead on the bona-fides of the marriage to the United States citizen spouse and the effect upon that marriage of the alien's enforced departure. Conceivably, some immigration judge might conclude that a case is meritorious if the grant of section 245 adjustment will help to maintain the integrity of the American marriage, even though the alien's prior conduct was such as would, standing alone, warrant denial. In my estimation, it is more in keeping with the Congressional intent underlying such remedial measures to focus on the needs of the American family.

The favorable exercise of administrative discretion in behalf of a section 245 applicant whose prior conduct may have been less than acceptable does not necessarily constitute approval of such conduct. Good moral character is not a statutory prerequisite to the issuance of an immigrant visa or to entry into the United States. Neither is good moral character a statutory requirement for section 245 eligibility. We have held that in determining whether to exercise administrative dis-

cretion favorably in behalf of an eligible alien, we may properly consider his moral character as a relevant factor. The courts have sustained us in this view. It by no means follows, however, that the favorable exercise of discretion constitutes an endorsement of all the alien's prior conduct. If that were so, we could hardly grant relief to any alien whose prior conduct we consider immoral or otherwise improper.

In granting discretionary relief to an eligible alien who has otherwise erred, we do so *despite* his transgression. Far from approving his misconduct, our grant of relief is a discretionary determination that there are factors present which, on balance, warrant forebearance even in the face of the adverse factors. That was the consideration underlying the rule we enunciated in *Matter of Arai*, supra, which I have underscored in the excerpt quoted above. I think that was a good rule and that it is a mistake to recede from it in favor of the vague and illusory standard that the case be "meritorious."

The respondent is living with and supporting his United States citizen wife. This was not a contrived, last-minute relationship. The respondent and his wife met shortly after his arrival in 1970 and were married on March 18, 1973, shortly after his divorce from his first wife. The bona-fides of the marriage is not disputed. Respondent is contributing $150 a month for the support of his children and former wife in the Philippines. If he were outside the United States now, he could readily obtain an immigrant visa and return to the United States for permanent residence, since an immigrant visa is immediately available to him. Thus, at a minimum, the net effect of denying section 245 relief will be to require the expenditure of funds needed for a round trip to the Philippines and for the respondent's maintenance there pending issuance of the visa. With stated exceptions not here applicable, section 245 was designed to obviate the need for such departure and return by an alien to whom a visa is thus readily available. The respondent's departure will disrupt, temporarily at least, his marriage to a United States citizen and will cost much money. It will not, in any event, restore him to his family in the Philippines. Such a harsh result is not required to vindicate the integrity of our visa-issuing process.

The Board today not only reestablishes the vague pre-*Arai* standards but asserts a new and regressive notion: "The provisions of the Immigration and Nationality Act are supposed to favor the *reuniting* of families." (Opinion, p. 6; emphasis in original). This novel hypothesis, with its emphasis on *reuniting*, downgrades the notion that the immigration laws are also intent on *uniting* (i.e., not separating) existing family units. The implication is that Congress was concerned only with relief for aliens abroad who already had an American family member (i.e., reuniting an already-existing family) and not with aliens already here whose American family member was acquired after entry. The

637

cases do not support this thesis. See, e.g., *INS* v. *Errico*, 385 U.S. 214 (1966). The statute there involved was liberally construed in light of the Congressional policy of uniting families. It is interesting to note that both aliens there involved acquired their American families *after* entry. The statutory provision there involved, section 241(f) of the Act, is not discretionary but mandatory. It bars the deportation of aliens who obtained visas or entry by fraud if they have the necessary familial ties to American citizens or legally resident aliens. Can it be imagined that Congress intended to be less generous in the case of an American citizen whose alien spouse already has visa eligibility?

Congress has indicated its desire to keep family units together by allowing otherwise *ineligible* aliens to enter or remain in the United States with close relatives who are citizens or resident aliens. The Board now twists this beneficient policy into one that results in the denial of relief to *eligible* aliens in order to force them to join (or to discourage them from leaving) their family members abroad. Whatever dubious validity such a policy might have in cases where the eligible alien is still free to rejoin his family members abroad, it can have no justification in a situation such as the present one, where the family tie abroad has been completely severed and the alien is now part of a bona fide American family unit. I find it hard to believe that Congress intended the immigration laws to be enforced in such a way as to break up the American family unit out of compassion for the disrupted foreign family unit, especially when it is clear, in a realistic sense, that the foreign family unit cannot again be made whole. Such a result is destructive. It injures the American citizen without at the same time helping the disrupted family abroad. Congress could never have intended such a result.

For the foregoing reasons, I would sustain the appeal and grant respondent's application for adjustment under section 245.

**Louisa Wilson, Member, Dissenting:**

I concur in the opinion of the Chairman and would sustain the appeal and grant the respondent's application for adjustment of status under section 245 of the Immigration and Nationality Act.

**BEFORE THE BOARD**
**(October 31, 1974)**

The Board being evenly divided as to the nature of the order to be entered on the Service's motion, the motion will be denied without opinion. The Chairman believes that the case should be referred to the Attorney General for review under 8 CFR 3.1(h)(ii).

*ORDER:* The motion is denied.

*Further order:* The record is referred to the Attorney General for review pursuant to 8 CFR 3.1(h)(ii).

### BEFORE THE ATTORNEY GENERAL
#### (March 10, 1976)

This matter was referred to me for review pursuant to 8 CFR § 3.1(h)(ii)(1975) by the then Chairman of the Board of Immigration Appeals. In the proceedings below, respondent was found to have overstayed his nonimmigrant visitor's visa and, accordingly, to be deportable under Section 241(a)(2) of the Immigration and Nationality Act (hereinafter referred to as the "Act"), 8 U.S.C. § 1251(a)(2). He was granted permission by the immigration judge to depart voluntarily from the United States in lieu of deportation. During his hearing before the immigration judge, respondent submitted an application under Section 245 of the Act, 8 U.S.C. § 1255, for adjustment of his status to that of an alien lawfully admitted for permanent residence based upon his marriage to an American citizen. That application was denied as a matter of discretion. The Board of Immigration Appeals unanimously agreed that respondent was deportable and, in a divided decision, affirmed the immigration judge's denial of Section 245 relief: In the event respondent failed to depart when and as provided, the Board ordered him deported.

The respondent, Pedro Calija Blas, is a 41-year-old male citizen of the Philippines. He was admitted to the United States as a nonimmigrant visitor on or about September 21, 1970. The length of stay proposed in his visa application was thirty-five days. On November 13, 1972, respondent was granted the privilege of departing voluntarily from the United States on or before November 28, 1972, without the issuance of an order to show cause, but failed to depart within the specified time.

When respondent came to the United States, he left behind in the Philippines a wife and four minor children. He and his wife had had various differences and, before leaving the Philippines, he decided to obtain a divorce in the United States (Tr. at 11, 18, 19, 20), there being no provision for divorce in the Philippines. He further hoped to remarry in the United States following his divorce and to remain in this country (Tr. at 19).

On his arrival, respondent stayed with his adoptive parents, United States citizens, who had adopted him in the Philippines when he was a year and a half old. The deportation hearing developed that he had communicated with them prior to coming to the United States with a view to having them submit a petition for his permanent residence (Tr. at 18, 20, 22). Although the record is unclear, it appears that they did file a petition to accord him immediate relative status which was approved on May 31, 1972. This petition, however, appears never to have

matured into adjustment to permanent resident status,[1] and because of disagreement growing out of his upcoming divorce and remarriage, his adoptive parents subsequently withdrew their petition, and approval was revoked on November 8, 1972.

A few weeks after arrival, respondent met Rufina Agcaoili, a native of the Philippines, who was then a permanent resident and is now a citizen of the United States. She became his "girl friend." In early 1973, respondent obtained a divorce from his wife in Reno, Nevada. On March 18, 1973, respondent and Rufina were married. The bona fides of that marriage is not in question (Tr. at 35). Respondent's present wife has filed an immediate relative visa petition in his behalf, and that petition has been approved.

When he applied for his visitor's visa, respondent stated that the purpose of his visit was simply a "pleasure trip." He gave no indication of his intention to obtain a United States divorce while here, nor of his intention to visit his adoptive parents. He stated in his application that his "parents" were not in the United States, and that he was employed as a "Supervisor" by Starlite-Philippines, Inc. in Manila. While respondent's natural parents were not in the United States, his adoptive parents, as noted above, were, and he intended to visit them. Furthermore, the record reveals that while respondent did contract work for Starlite at nights, he worked a regular eight-hour day as a draftsman for the Mitsui Corporation. While none of these facts, if revealed, would legally have barred his entry into the United States as a visitor, his misrepresentations taken together created the impression that his ties to the Philippines were significantly stronger than they were in fact. Inasmuch as those ties would bolster the likelihood that respondent would leave the United States and return to the Philippines when his visa expired, his failure to disclose fully the facts relating to his background and intentions may have enhanced the likelihood that a nonimmigrant visa would be issued.

The omissions discussed above, my view of the quality of which will be elaborated upon *infra*, are serious when viewed in light of the totality of the circumstances of this case. However I conclude that they do not amount to fraud or willful misrepresentation of a material fact so as to preclude eligibility for a visa under Section 212(a)(19) of the Act, 8 U.S.C. 1182(a)(19). See *Matter of S— and B—C—*, 9 I. & N. Dec. 436 (A.G. 1961). Therefore, I find respondent eligible for adjustment of status under Section 245.

While respondent meets the statutory requirements for adjustment of status, the immigration judge, and the Board on appeal, denied that

---

[1] The Board of Immigration Appeals found that during the times here pertinent the fourth preference quota for the Philippines into which the petition of his step-parents put respondent was oversubscribed.

relief in the exercise of administrative discretion. The appropriateness of the Board's decision is now before me.

The Board has held that Section 245 does not contemplate—

... that all aliens who meet the required legal standards will be granted adjustment of status to that of a permanent resident since the grant of an application for adjustment of status is a matter of discretion and of administrative grace, not mere eligibility; discretion must be exercised by the Attorney General even though statutory prerequisites have been met.

*Matter of Ortiz-Prieto,* 11 I. & N. Dec. 317 (BIA 1965); see *Santos v. INS,* 375 F.2d 262 (C.A. 9, 1967). Discretion does not, however, imply a decision without standards or that standards perceived as generally applicable should remain the private beacon of the decision-maker. Rather when a balance of positive and adverse factors can be struck in general terms which, while retaining flexibility, provides both a touchstone for future decision-making and a focus for future argument by parties involved, such a determination should be expressed, disseminated, and maintained unless and until subsequently shown to be unworkable or unjust. See Sofaer, *Judicial Control of Informal Discretionary Adjudication and Enforcement,* 72 Colum. L. Rev. 1293 (1972); Roberts, *The Exercise of Administrative Discretion Under the Immigration Laws,* 13 San Diego L. Rev. 144 (1975); Davis, *Administrative Law Text* (1972) Ch. 4. Such guidelines were advanced by the Board with respect to Section 245 petitions in *Matter of Arai,* 13 I. & N. Dec. 494 (BIA 1970):

It is difficult and probably inadvisable to set up restrictive guide lines for the exercise of discretion. Problems which may arise in applications for adjustment of status must of necessity be resolved on an individual basis. Where adverse factors are present in a given application, it may be necessary for the applicant to offset these by a showing of unusual or even outstanding equities. Generally, favorable factors such as family ties, hardship, length of residence in the United States, etc., will be considered as countervailing factors meriting favorable exercise of administrative discretion. In the absence of adverse factors, adjustment will ordinarily be granted, still as a matter of discretion.

Procedurally, this statement by the Board does not establish rigid rules which deny to immigration judges the flexibility necessary to carry out their duty to analyze sensitively the competing factors in each particular case. It does, however, call for an explanation when certain considerations which would ordinarily be regarded as significant are not dispositive. In requiring such an explanation, the *Arai* standard adopted by the Board attempts to move toward greater equity in the exercise of discretionary adjustment authority.

Substantively, with regard to the spousal relation at issue here, the standard is consistent with the special solicitude which the courts, in other contexts, have found appropriate in treating marital affairs. Cf. *Griswold v. Connecticut,* 381 U.S. 479, 486 (1965); *Loving v. Virginia,*

388 U.S. 1, 12 (1967). Likewise Congress has indicated that in the area of immigration law, close family ties are to be accorded special significance. See Sections 201, 203, 212(i), 241(f) of the Act, 8 U.S.C. §§ 1151, 1153, 1182(i), 1251(f). Although adjustment is not necessarily available on a simple showing of eligibility, that showing, particularly where eligibility carries with it its own strong equities, as with immediate relative status, can have a positive influence on the exercise of discretion and in the absence of adverse circumstances should prevail.[2]

Although an application for adjustment based on immediate relative status is thus initially appealing, the quality of the case presented can be undercut. Most damaging, of course, is the presence of factors raising doubts as to the bona fides of the underlying relationship between the alien and the citizen. No substantial factors of this nature appear in this case. The record is as assessed by the immigration judge:

> From what I can see of this case, the marriage is apparently a bona fide one. In that respect it differs from a number that I've had. I believe we have no cause at least to suspect that the marriage is not a bona fide one.

(Tr. at 35).

The immigration judge and a majority of the Board, however, have advanced two other policy considerations believed by both to outweigh any equities favoring preservation of respondent's present marriage through adjustment of his status. The record does indicate that respondent entered the United States with the intention of divorcing his wife who remained in the Philippines. It also indicates that he came to this country harbouring hopes that arrangements could be made which would allow him legally to stay. Specifically, he hoped that either remarriage to an American citizen or an adjustment petition filed by his adoptive parents would lead to permanent residence (Tr. at 19–20). The immigration judge and the majority of the Board found that in pursuing his plans, respondent did not reveal relevant facts to the American Consul at the time of his visa application. The judge and a majority of the Board were of the opinion that to grant adjustment under these circumstances would be to condone fraud in the visa process and to promote the abandonment of a foreign spouse and children.

Primary emphasis in both the trial judge's opinion and in the prevailing appellate opinion is placed upon the view that adjustment on the facts of this case would constitute unjustified complicity in the abandonment of respondent's former wife and children. But a denial of adjustment will not restore Blas to his family. He is now legally divorced. He has been away from the Philippines for more than four

---

[2] As pointed out in Chairman Roberts' dissent in this case, the equities in preserving a current bona fide marriage are no less simply because that marriage occurred after entry into the United States.

years. The foreign family unit cannot again be made whole, and responsibility for precipitation of its dissolution is by no means clear. In sum, this record does not support denial of adjustment for the purpose of vindicating respondent's former marriage.[3]

Although both the immigration judge and a majority of the appellate board relied primarily on the effect of adjustment upon the foreign marriage, both made findings concerning, and offered as a subsidiary ground for denial of adjustment, respondent's misleading responses in seeking his initial visitor's visa. These factual distortions, noted above, served, and appear to have been intended to serve, to mislead immigration officials concerning the true nature and purpose of respondent's desire to enter the United States. I conclude therefore that those responses, in the context presented by this case, warrant denial of respondent's Section 245 application.

In reaching this conclusion, I am mindful of the general balance struck by Congress in the deportation context between the equities of immediate relative status and the deleterious systemic consequences of condoning fraud in the procurement of entry documents. Section 241(f) of the Immigration and Nationality Act, 8 U.S.C. § 1251(f), states:

> The provisions of this section relating to the deportation of aliens within the United States on the ground that they were excludable at the time of entry as aliens who have sought to procure, or have procured visas or other documentation, or entry into the United States by fraud or misrepresentation shall not apply to an alien otherwise admissible at the time of entry who is the spouse, parent or a child of a United States citizen or of an alien lawfully admitted for permanent residence.

While this provision offers no relief to those whose fraud concealed an independent substantive ground for deportation, it does waive deportation based on the act of fraud itself when after-acquired family ties are raised. *Reid* v. *INS*, 420 U.S. 619 (1975).

Section 241(f) is not, of course, specifically applicable to Section 245 adjustment determinations. Furthermore, on the peculiar facts of this case, it is my opinion that it does not control the exercise of my discretion. Here the misleading omissions which occurred, while not rising to the level of actual fraud, were in furtherance of a concerted plan calculated to produce the equity which respondent now asserts should support favorable exercise of administrative discretion—to wit, an American marriage. Such conscious construction of an equity must in the nature of things dilute the quality of that equity and abate its ability to counterbalance the adverse impact of actions committed to produce it. Although family ties will ordinarily result in favorable exercise of Section 245 administrative discretion, it is my opinion that they neither

---

[3] As all five members of the Board of Immigration Appeals were quick to point out, only the facts of this case are relevant to its decision. Generalizations concerning any group of aliens or judgments formed on the basis of facts in other cases are altogether out of place.

must nor should do so where it appears that the alien has engaged in a course of deception designed to produce those very ties. Since this case presents no alternative affirmative equities sufficient to overcome the adverse impact of respondent's misrepresentations in applying for entry to this country, the denial of respondent's Section 245 application was appropriate.

For the reasons stated above, the order of the Board of Immigration Appeals denying respondent's application for permanent resident status, permitting respondent to depart voluntarily from the United States, and, should respondent fail to so depart, providing for his deportation is affirmed.