Warren HENRY, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 95–1679.

United States Court of Appeals,
First Circuit.

Heard Dec. 7, 1995.

Decided Jan. 16, 1996.

Stanley H. Wallenstein, New York City, for petitioner.

Kristen A. Giuffreda, Office of Immigration Litigation, United States Department of Justice, with whom Frank W. Hunger, Assistant Attorney General, and Ellen Sue Shapiro, Senior Litigation Counsel, were on brief, Washington, DC, for respondent.

Before TORRUELLA, Chief Judge, ALDRICH, Senior Circuit Judge, and SELYA, Circuit Judge.

SELYA, Circuit Judge.

Invoking 8 U.S.C. § 1105a(a) (1994), petitioner Warren Henry seeks judicial review of an order of the Board of Immigration Appeals (the Board) denying his request for adjustment of status and directing his deportation. We dismiss the petition.

## I

Petitioner, a 24–year–old Jamaican national, has resided in the United States since late 1984. His parents and four siblings live here.[1] Petitioner completed high school and one year of college. He wed a United States citizen, but the marriage did not last. He has a son by another woman. His son lives in the United States, but not with petitioner—and petitioner does not support the boy on a regular basis. Petitioner's overall work record is spotty. He currently operates a hair-styling salon in Springfield, Massachusetts.

Petitioner is no stranger to the legal system. In May of 1991, New York authorities charged him with assault with intent to cause serious harm, criminal possession of a weapon, and menacing. About three weeks thereafter, the police arrested him for jumping the turnstiles on the New York City subway system. Initially, he failed to respond to these charges. When he appeared two years later—doubtless prompted by his desire to avoid looming deportation—the court reduced the charges arising out of the first incident to a single count of simple assault. Petitioner pled guilty both to this reduced charge and to the turnstile-jumping charge. The court imposed a one-year conditional discharge in respect to the former and a fine in respect to the latter.

Another brush with the law proved to be a catalyst for deportation proceedings. On Oc-

---

1. His parents, a brother, and a sister are United States citizens. His other two siblings have permanent resident status. Some relatives still live in Jamaica.

tober 13, 1991, Springfield police officers found petitioner (who was carrying false identification papers) in possession of an unlicensed handgun. He pled guilty to a weapons-possession charge on January 13, 1992, using his pseudonym ("Richard Dave Gordon"), and spent several months in jail. On February 4, 1992, the Immigration and Naturalization Service (INS) instituted deportation proceedings.

During the pendency of the proceedings, petitioner had another close encounter with the law. On December 2, 1992, Springfield authorities charged him with assaulting a police officer. The facts surrounding that incident are less than pellucid. The police officer's arrest report states that he restrained petitioner after petitioner made a threatening gesture in response to an inquiry, and that petitioner then hit him. Petitioner categorically denies this account, and says that he neither threatened nor struck the officer. On the date of petitioner's deportation hearing, the assault charge was still pending, and the record reveals no definitive disposition (although, at oral argument before us, petitioner's counsel represented that the charge is now by the boards).

## II

At this juncture, we temporarily shift our focus to the statutory scheme. Petitioner's conviction on the firearms charge rendered him deportable under section 241 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1251.[2] Confronted by this statute, petitioner attempted to confess and avoid: he conceded deportability, but sought an adjustment of status under INA § 245(a), 8 U.S.C.

§ 1255(a).[3] This course was theoretically open because, under the immigration laws, the grounds for deportation are not congruent with those for exclusion of aliens. Thus, petitioner's firearms conviction rendered him deportable, but not per se excludable. *Compare* 8 U.S.C. § 1251(a)(2)(C) *with id.* § 1182(a) (listing grounds for exclusion).

Generally speaking, resident aliens who are subject to exclusion upon leaving and attempting to reenter the country may apply for waivers of inadmissibility under INA § 212(c), 8 U.S.C. § 1182(c).[4] Section 212(c) waivers are equally available to aliens in deportation proceedings as long as the ground for deportation is also a stated ground for exclusion. *See Campos v. INS*, 961 F.2d 309, 313 (1st Cir.1992). But such waivers are not available to aliens in deportation proceedings when the ground for deportation is not also a stated ground for exclusion. *See id.* at 316.

## III

Petitioner's case falls between these stools. Lacking the foundational prerequisite for seeking a section 212(c) waiver, he opted to use an application for adjustment of status under section 245(a) as an alternate vehicle. *See Matter of Rainford*, Interim Dec. No. 3191, at 6 (BIA 1992) (authorizing status-adjustment applications in such circumstances). The INS acknowledges that he is eligible to be considered for adjustment of status under section 245(a). Whether he deserves the relief is a different story. On that score, an immigration judge (IJ) initially considered and denied petitioner's application for adjustment of status. He explained that

---

2. The statute provides in pertinent part:

Any alien who at any time after entry is convicted under any law of purchasing, selling, offering for sale, exchanging, using, owning, possessing, or carrying ... any weapon, part, or accessory which is a firearm or destructive device ... in violation of any law is deportable.

8 U.S.C. § 1251(a)(2)(C) (1994).

3. The statute provides in pertinent part:

The status of an alien who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully

admitted for permanent residence [subject to certain enumerated conditions not relevant here].

8 U.S.C. § 1255(a) (1994).

4. The statute provides in pertinent part:

Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to [many of the grounds for exclusion].

8 U.S.C. § 1182(c) (1994).

a section 245(a) adjustment is a discretionary remedy; that to receive such a benefice an otherwise deportable alien must show unusual or outstanding equities sufficient to overbalance the negative factor(s) on which the finding of deportability rests; and that, in petitioner's case, the equities did not adequately preponderate in his favor.

Petitioner appealed. *See* 8 C.F.R. § 3.1(b)(2) (1995) (providing for administrative appeals of such orders). The Board, exercising de novo review, *see Gouveia v. INS*, 980 F.2d 814, 817 (1st Cir.1992), denied relief. In its view, petitioner's strong points, e.g., his family ties to the United States, his protracted residence here, and his belated efforts at rehabilitation, did not overcome the discredit inherent in his criminal record.

## IV

We do not print on a pristine page. The IJ made extensive findings in this matter, and the Board issued a comprehensive decision adopting many of those findings. After careful perscrutation of the record, we discern no fatal flaw in the Board's rationale. Thus, we uphold the denial of petitioner's request for adjustment of status for essentially the reasons stated by the Board, adding relatively few comments.

### A.

■ The decision to grant or deny an application for adjustment of status is one that rests within the informed discretion of the Attorney General, *see* 8 U.S.C. § 1255(a), and, by delegation, within the informed discretion of the Board. As a result, the ambit of judicial review is tightly circumscribed. Courts are entitled to probe the Board's discretionary decisions only to the extent necessary to ascertain whether the Board misread the law or otherwise misused its discretion. *See Martinez v. INS*, 970 F.2d 973, 974 (1st Cir.1992).

■ To be sure, adjudicatory tribunals can exceed grants of discretion—even ringing grants of broad, essentially standardless discretion—in various ways. We have pointed out that courts can abuse discretion in any of three aspects, namely, by neglecting to consider a significant factor that appropriately bears on the discretionary decision, by attaching weight to a factor that does not appropriately bear on the decision, or by assaying all the proper factors and no improper ones, but nonetheless making a clear judgmental error in weighing them. *See, e.g., United States v. Roberts,* 978 F.2d 17, 21 (1st Cir.1992); *Independent Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.,* 864 F.2d 927, 929 (1st Cir.1988). Like a court, so, too, an administrative adjudicative body charged with making a discretionary decision can stray beyond the pale in any of these three ways.

### B.

Petitioner asserts that the Board abused its discretion in all the respects that we have mentioned. We deal briefly with each facet of this trifurcated assertion.

### 1.

■ First and foremost, petitioner asseverates that the Board improperly failed to consider all the factors favorable to him. In particular, citing *Matter of Marin,* 16 I & N Dec. 581, 584–85 (BIA 1978), a section 212(c) waiver case, he maintains that the Board unnecessarily limited the data it considered in assessing the equities underpinning his request for adjustment of status.

In the section 212(c) milieu, the Board and reviewing courts habitually refer to a stock list of factors that potentially inform the equities attendant to a waiver.[5] Petitioner asks us to transplant this list wholesale and mandate its use in connection with status-adjustment applications under section 245(a).

---

**5.** These factors include:
(1) family ties within the United States; (2) residence of long duration in the United States; (3) evidence of hardship to petitioner or petitioner's family if deportation occurs; (4) service in the United States Armed Forces; (5) a steady employment history; (6) the existence of property or business ties in this country; (7) community service; (8) rehabilitation; and (9) any other evidence fairly indicating petitioner's good character.
*Gouveia,* 980 F.2d at 816 (citing *Marin,* 16 I & N Dec. at 584–85).

This importuning reaches too far: fairly viewed, it solicits the overruling, *sub silentio,* of this court's decision in *Campos.* There, we held that the Attorney General could rationally decide not to make section 212(c) waiver relief available to aliens convicted of firearms offenses that rendered them deportable but not automatically excludable. *See Campos,* 961 F.2d at 316. In so holding, we made it crystal clear that the section 212(c) waiver provision, 8 U.S.C. § 1182(c), "could *not* be utilized to waive *all* grounds of deportability, but only those grounds of deportability having a corresponding ground of excludability. . . ." *Id.* at 313 (emphasis in original).

Petitioner today tries to bring in through the back door the same iteration that the *Campos* court barred at the front door. His core argument is that the Board abused its discretion by not applying the section 212(c) waiver criteria to an adjustment of status case. Were we to accept this construct, we would effectively require INS to afford deportable but not necessarily excludable aliens (like petitioner) relief exactly equivalent to that available under 8 U.S.C. § 1182(c). But we expressly declined to dictate such a result when we concluded in *Campos* that the law did not make waiver of inadmissibility available to all deportable aliens.

We see no reason to revisit the matter. When all is said and done, waiver of inadmissibility is an extraordinary discretionary remedy that Congress, in enacting section 212(c), made available primarily to assist excludable aliens who had been long-term residents of this country. *See Campos,* 961 F.2d at 316. Congress painstakingly set the limits within which the waiver proviso is to operate. The courts have no roving writ that enables them to refashion the legislature's handiwork and stretch the statute to cover all cases in which a person might suffer deportation as a result of his own crimes.[6]

In any event, the argument that petitioner advances is largely academic in the circumstances at hand. Even in section 212(c) waiver cases, the *Marin* factors are only illustrative. They do not comprise an invariable checklist. *See Hazime v. INS,* 17 F.3d 136, 140 (6th Cir.) (explaining that the Board need not address all the *Marin* criteria in reaching its decision), *cert. denied,* —— U.S. ——, 115 S.Ct. 331, 130 L.Ed.2d 289 (1994). So long as the Board gives adequate consideration to the equities supporting a favorable exercise of discretion, it discharges its duty under section 212(c). *See id.; see also Marin,* 16 I & N Dec. at 585.

In this instance, the administrative record makes it plain that the Board paid satisfactory heed to the relevant factors. It explicitly noted petitioner's length of residence, his family ties, his tentative steps toward rehabilitation, and the conceivable hardships (including the likely loss of his proprietary interest in a start-up business). Petitioner offered no evidence regarding military service or community activities. Thus, the Board in effect considered all the pertinent *Marin* factors despite the absence of any obligation to do so. Petitioner has no valid ground for his *Marin*-based complaint.

### 2.

Next, petitioner posits that the Board pondered a factor that should have been excluded from the decisional calculus: his 1992 arrest for allegedly assaulting a police officer. He pegs this claim on *Matter of Arreguin,* Interim Dec. No. 3247 (BIA 1995), a case decided four days before the Board decided Henry's appeal, and asserts that *Arreguin* stands for a black-letter rule proscribing consideration of arrest reports.

We begin with basics. The law recognizes that in an agency as large as the INS different officials may not act identically in every case. This lack of complete uniformity is unavoidable—after all, administrators are

---

6. We note, too, that petitioner's construct not only would overrun the limits applicable to section 212(c) waivers, but also would serve to create two different adjustment of status standards: one for criminals ineligible for waiver of inadmissibility, and another for students, temporary

employees, and the myriad of non-resident immigrants eligible for adjustment of status. We think the Board's decision to preserve the unity of its status-adjustment standard is eminently reasonable, and we discern no abuse of discretion here.

not automatons—and does not, in an of itself, invalidate agency action. Nonetheless, agencies do not have carte blanche. While a certain amount of asymmetry is lawful, *see Davila–Bardales v. INS*, 27 F.3d 1, 5 (1st Cir.1994); *Puerto Rican Cement Co. v. EPA*, 889 F.2d 292, 299 (1st Cir.1989), an agency may not "adopt[ ] significantly inconsistent policies that result in the creation of conflicting lines of precedent governing the identical situation." *Davila–Bardales*, 27 F.3d at 5 (citation and internal quotation marks omitted).

█ Let us be perfectly clear: the precept counselling avoidance of inconsistent administrative policies does not freeze an agency's jurisprudence for all time. *See, e.g., Congreso de Uniones Industriales de P.R. v. NLRB*, 966 F.2d 36, 39 (1st Cir.1992); *Shaw's Supermarkets, Inc. v. NLRB*, 884 F.2d 34, 37 (1st Cir.1989). The precept demands, however, that if the "administrative agency decides to depart significantly from its own precedent, it must confront the issue squarely and explain why the departure is reasonable." *Davila–Bardales*, 27 F.3d at 4. In other words, administrative agencies must apply the same basic rules to all similarly situated supplicants. An agency cannot merely flit serendipitously from case to case, like a bee buzzing from flower to flower, making up the rules as it goes along.

It is against this chiseled backdrop that we turn to *Arreguin*. There, the Board reversed an IJ's refusal to grant a section 212(c) waiver to an alien convicted of playing a minor role in a marijuana importing scheme. In denying relief, the IJ considered a twelve-year-old arrest record on charges (later dropped) of smuggling aliens into the United States. *See Arreguin, supra*, at 8. While the Board sanctioned the admissibility of the arrest record into evidence, it explained that, under the circumstances, it would give the record scant weight. *See id.* Petitioner maintains that *Arreguin* establishes a black-letter rule gainsaying reliance on arrest records, and, thus, that consistency of precedent requires reversal of the instant order. We demur: the Board's decision in *Arreguin* did not require it *ipso facto* to disregard altogether the report of petitioner's 1992 arrest.

The principal problem presented by petitioner's prohibitory proposition is *Arreguin* itself. The case simply does not announce the rigid rule that petitioner ascribes to it. There, the Board approved the IJ's admission of a particularly vulnerable arrest record into evidence, and agreed that it had some probative value. *See id.* The difficulty was that, *under the circumstances of the particular case*, the IJ gave the record more weight than it deserved, and, concomitantly, neglected to give full effect to many positive elements buttressing the petitioner's case. Properly read, *Arreguin* implicates matters of degree, explaining the relative weight that should be given to arrest records. Nothing in the opinion suggests that, when facing a closer balance of equities, the Board might not properly decide that a record of arrest tips the scales against the bestowal of discretionary relief.

█ Nor does *Arreguin* represent an alteration of prior precedent. The traditional rules of evidence do not apply in immigration hearings, *see, e.g., Espinoza v. INS*, 45 F.3d 308, 310 (9th Cir.1995), and arrest reports historically have been admissible in such proceedings, *see Paredes–Urrestarazu v. INS*, 36 F.3d 801, 813 (9th Cir.1994) (holding that the Board may entertain arrest records as evidence). Moreover, while an arrest, without more, is simply an unproven charge, the fact of the arrest, and its attendant circumstances, often have probative value in immigration proceedings. *See, e.g., id.* at 810 ("The fact of arrest, insofar as it bears upon whether an alien might have engaged in underlying conduct and insofar as facts probative of an alien's 'bad character or undesirability as a permanent resident' arise from the arrest itself, plainly can have relevance" in discretionary relief). *Arreguin* does not purport to command any deviation from these venerable practices or to prohibit the type of recourse that the Board historically has made to arrest records.

In fine, the lesson of *Arreguin* is that, when the Board appraises the considerations on both sides of the discretionary balance to determine whether they are in equipoise, it

will accord virtually no weight to an arrest record remote in time and unsupported by corroborating evidence. *See Arreguin, supra*, at 8. Here, the Board adumbrated that rather unremarkable lesson. It considered the 1992 arrest report in a limited way, without giving excessive weight to it. It was entitled to do so, *Arreguin* notwithstanding.[7]

### 3.

██ In his most broad-gauged foray, petitioner maintains that the Board drew the wrong conclusions from the factors it considered. In this context, petitioner complains that he demonstrated strong familial ties to the United States, long-term residency here, and hardship in the event of deportation. These, he continues, are the very factors the Board has required a petitioner to demonstrate in order to make the showing of outstanding equities necessary to overcome strong negative factors. *See Matter of Arai*, 13 I & N Dec. 494, 496 (BIA 1970).

██ Petitioner's argument misapprehends both the nature of status adjustment and the role of judicial review. Adjustment of status is not an entitlement, but, rather, an extraordinary remedy. The Board need not make the anodyne available to all who theoretically qualify. Indeed, the Attorney General has cautioned that the Board's regimen in *Arai* "does not establish rigid rules which deny to immigration judges the flexibility necessary to carry out their duty to analyze sensitively the competing factors in each particular case." *Matter of Blas*, 15 I & N Dec. 626, 641 (Atty.Gen.1976), *aff'd*, 556 F.2d 586 (9th Cir.1977). Thus, status adjustment is quintessentially a matter "of administrative discretion." *Arai*, 13 I & N Dec. at 496.

██ Moreover, when a matter is committed by law to the Board's sound discretion, a reviewing court plays a very restricted role in overseeing the administrative exercise of that discretion. So long as the Board follows its own settled principles and provides a reasoned explanation for its decision, judicial review is at an end. *See Gouveia*, 980 F.2d at 818; *Martinez*, 970 F.2d at 974.

Of course, discretion is not to be confused with imperiousness. When the Board rejects a request for adjustment of status, it must articulate its reasons for taking that action, and those reasons must be plausible. Nonetheless, the existence of favorable information under each of the three *Arai* headings does not require the Board to grant adjustment of status. *See Blas*, 15 I & N Dec. at 641. As we have written in an analogous setting, "even the presence of preponderant equities or equities that in the abstract could qualify as 'unusual' or 'outstanding' does not compel the Board to grant relief." *Gouveia*, 980 F.2d at 816.

Here, the Board offered an adequate explanation of why it believed that petitioner's favorable factors were not sufficiently compelling to justify adjustment of status. The Board's decision focused on the seriousness of the firearms conviction. It observed that both petitioner and his companion were armed at the time of the arrest, and that petitioner had maintained a deception by utilizing a pseudonym throughout the criminal proceedings. The Board also looked to petitioner's history of altercations with the law, particularly his tardiness in acknowledging his crimes in New York. It took due note of the favorable factors advanced by petitioner but determined, on balance, that these points were not sufficiently robust to yield the kind of unusual and outstanding equitable case that would warrant an adjustment of status. In short, the Board persuasively explained the premises on which it declined to exercise its discretion. That ends the matter. A reviewing court may not reweigh the equities afresh. *See Gouveia*, 980 F.2d at 819.

---

7. Petitioner's reliance on *Arreguin* is misplaced for other reasons as well. For one thing, *Arreguin* is a section 212(c) waiver case, and there is no requirement that the Board treat section 245(a) status adjustment cases like waiver cases. For another thing, Henry himself offered the arrest record as evidence before the IJ, apparently as part of an attempt to explain away the incident in question. It ill behooves him to complain on appeal that the Board should not have paid heed to evidence that he proffered. *See Johnson v. INS*, 971 F.2d 340, 343 (9th Cir.1992) (recognizing that the doctrine of invited error precludes a petitioner from challenging the admissibility of evidence she proffered at her deportation hearing).

## V

We need go no further. Adjustment of status is a discretionary remedy. Although the Board could have afforded petitioner this remedy, it chose not to do so. That is both the Board's prerogative and its duty. In the absence of either a mistake of law or a palpable abuse of discretion, we cannot substitute our judgment for that of the Board.

*The petition for review is denied and dismissed. The Board's decision and order are affirmed.*