HULL, Circuit Judge:
Freddy Jose Arguelles, a native and citizen of Venezuela and former Venezuelan Air Force pilot, has filed a petition for review of the Immigration Judge’s and Board of Immigration Appeals’ (“BIA”) denial of his applications for asylum, withholding of removal, adjustment of status, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (“CAT”). After the BIA ruled, Arguelles sought reopening of his case from the BIA, which was denied. Arguelles filed a separate petition for review of the BIA’s denial of reopening. This Court has consolidated his two petitions. ■
After careful review of the record and the parties’ briefs, and with the benefit of oral argument, we deny Arguelles’s peti *696 tions for review, affirm the BIA’s July 28, 2015 final order of removal to Venezuela, and affirm the BIA’s December 7, 2015 denial of reopening.
I. BACKGROUND
In March 2004, Arguelles entered the United States on a nonimmigrant visitor’s visa. Arguelles is a former Venezuelan Air Force pilot. In July 2004, the Department of Homeland Security (“DHS”) granted him asylum on the basis that he would be persecuted in Venezuela due to his 2002-2003 participation in demonstrations against President Hugo Chavez and membership in the group Militares Democráti-cos. In 2006, Arguelles’s status was adjusted to lawful permanent resident (“LPR”).
A. Criminal Conviction in 2012
In the 1980’s the United States sold F-16 airplanes to Venezuela, but sales of the parts for those airplanes are now restricted. On June 25, 2012, Arguelles was indicted for knowingly and willfully conspiring to export defense articles, including F-16 parts, designated on the United States Munitions List (the “Munitions List”) in violation of the Arms Export Control Act (AECA) in 22 U.S.C. § 2778(b)(2), without first obtaining the required license or written approval from the United States Department of State (the “State Department”). Section 2778 permits the President to designate defense articles and services to the Munitions List and prohibits the export of those items without a license. 22 U.S.C. § 2778(a)(1), (b)(2).
On October 5, 2012, Arguelles pleaded guilty to conspiracy to export defense articles in violation of the AECA, 22 U.S.C. § 2778(b)(2), and 18 U.S.C. § 871. The district court sentenced Arguelles to 23 months’ imprisonment. The “stipulated factual basis” accompanying Arguelles’s plea agreement contains the following facts.
Arguelles admitted that he, a former military pilot, and Alberto Pichardo, another former Venezuelan Air Force officer living in the United States, knowingly and willfully conspired, from January 2009 until February 2010, to procure and supply to the Venezuelan Air Force defense articles designated on the Munitions List. Arg-uelles . and Pichardo did not obtain a license or written approval from the State Department to make such sales.
Co-conspirators from outside the United States informed Arguelles and Pichardo that the Venezuelan Air Force wished to purchase certain defense articles. Arg-uelles and Pichardo attempted to procure the requested items from Phillip Klokke, a government informant.[1] Pichardo sent these five emails to Klokke regarding items on the Munitions List: (1) on or about January 23, 2009, discussing F-16 ejection seats and F-16 munitions, including AIM-9 Sidewinder missiles, Python-4 missiles, rocket launchers, 250-pound bombs, 500-pound bombs, Paveway laser-guided bomb kits, .50 caliber ammunition for Gatling guns, AMRAAM missiles, and AGM-54 missiles; (2) on or about February 23, 2009, seeking aircraft parts, including Cartridge Assemblies, Detonation Transfer Assemblies, and Initiators; (3) on or about March 27, 2009, resending the February 23 list; (4) on or about August 4, 2009, listing F-16 aircraft parts such as Rocket Motor Canopy Jettisons, Cartridge Assemblies, Drive Shafts, Bulkheads, LPRF Radars, XMTR Radars, Radar Antennas, and Oxygen Mask Facepieces; and (5) on or about October 23, 2009, discussing other F-16 parts, including radar equipment.
*697 On or about September 22, 2009, Arg-uelles, Pichardo, and a co-conspirator, “K.L.,”[2] attended a meeting with Klokke and discussed the sale of F-16 parts requested by the Venezuelan Air Force. On or about October 26, 2009, Arguelles met again with Pichardo and Klokke and discussed the F-16 parts as well as the sale of unmanned aerial vehicle engines to Venezuela. Also on or about October 26, 2009, Arguelles had a telephone conversation with Klokke regarding the sale of the unmanned aerial vehicle parts. On or about November 12, 2009, Arguelles, Pichardo, and Lezama met with Klokke and discussed the sale of the F-16 parts and unmanned aerial vehicle engines to Venezuela.
The government had copies or transcripts of emails, text messages, phone calls, and meetings of Arguelles and his co-conspirators regarding the purchase and delivery of the defense articles to Venezuela. The co-conspirators’ activities occurred from January 2009 to February 2010.
During the government’s investigation, Arguelles admitted to his “knowing and willful participation” in the conspiracy, that he was aware that his actions were illegal, and that he participated in the enterprise “for the money.” Arguelles stipulated that his conduct “was harmful to the security and foreign policy interests of the United States.”
B. Removal in 2014
Based on Arguelles’s criminal conviction, DHS served him with a notice to appear (“NTA”) on June 5,2014. The NTA alleged that Arguelles was removable under 8 U.S.C. § 1227(a)(4)(A)(i) because he engaged “in any activity to violate any law of the United States relating to espionage or sabotage or to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information.” (emphasis added); see Immigration and Nationality Act (“INA”) § 237(a)(4)(A)®, 8 . U.S.C. § 1227(a)(4)(A)®. The NTA recounted Arguelles’s guilty plea, sentence, and factual stipulation to having knowingly and willfully conspired to export defense articles on the Munitions List to Venezuela without approval from the State Department.
At his hearing on July 2, 2014, Arguelles denied that his conviction was for a crime of espionage or sabotage and that he was removable. He argued that his conviction was for violating an export law and was more akin to a regulatory violation than a crime and thus was not a particularly serious crime or a crime of moral turpitude. The immigration judge (“IJ”) disagreed and, relying on the judgment and factual information from his criminal case, found Arguelles removable by clear and convincing evidence.
The IJ’s written decision stated that the IJ “sustained the charge of removability under section 237(a)(4)(A)®,” which is 8 U.S.C. § 1227(a)(4)(A)®. That section makes removable “any alien who has engaged” in “any activity to violate any law of the United States relating to espionage or sabotage or to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information.” 8 U.S.C. § 1227(a)(4)(A)®. Based on the guilty plea and stipulated facts, the IJ concluded that Arguelles had engaged in an activity that violated United States export laws.
C. 2014 Application for Asylum, Withholding, & CAT Relief
Subsequently, Arguelles filed an application for asylum, withholding of removal, *698 and CAT relief. Arguelles’s application claimed that he feared persecution because of his political opinion and membership in a particular social group. He explained that he was a member of an elite unit of the Venezuelan Air Force and an opponent of the Chavez government. Arguelles focused on events that occurred back in 2002 to 2004. In 2002, Arguelles and his fellow officers protested in Plaza Francia in the Altamira neighborhood of Caracas. They became known as “the group of Altamira” and remained in the Plaza for over a year. The organizations involved in the protest, of which Arguelles was a member, were formally known as the Military for Democracy and the Institutional Military Front.
On December 6, 2002, a shooter with ties to President Chavez’s administration killed 3 demonstrators and injured 20 more. The Venezuelan government jailed and killed some of the other participants over the course of the year. Arguelles was discharged from the Air Force and stripped of his benefits. While other participants were jailed or killed, Arguelles received asylum in the United States.
In 2004, the Venezuelan government charged Arguelles with a crime based on his peaceful protest activities. Arguelles claimed that if he returned to Venezuela, he would be incarcerated and tortured because the charges against him are still pending and there is an outstanding warrant for his arrest. Arguelles stated that he was a prominent member of the protest group and still opposes the communist government, which is now run by President Nicolas Maduro. Arguelles claimed that one of his friends and mentors in the Air Force was arrested in 2014 for allegedly plotting a coup, which demonstrates that the government is still suspicious of the Air Force, Lastly, Arguelles alleged that his wife, who is a U.S. citizen, would be in danger in Venezuela because she was one of the attorneys who represented the group of Altamira.
D. 2014 Application for Adjustment of Status & Waiver
Later in August 2014, Arguelles filed an application for (1) adjustment of status and (2) a waiver of his ground of inadmissibility based on hardships to his family if he returned to Venezuela. Arguelles again contended that his conviction was for a regulatory or licensing violation and was not a crime of moral turpitude. Alternatively, Arguelles sought a waiver on the basis that his U.S. citizen wife, children, and permanent resident mother would suffer extreme hardship if a waiver was not granted.
II. 2015 HEARING ON APPLICATIONS
In January 2015, the IJ held a hearing on the merits of Arguelles’s applications.
A. Arguelles’s Testimony
Arguelles entered the United States in 2004 at the age of thirty and was thirty-eight at the time of his conviction. According to Arguelles, he signed the stipulation of facts, despite having concerns about the facts stated therein. His attorney informed him that everyone involved in the case was aware of the extent of his participation in the conspiracy and, that if they changed the wording, the judge would not accept the plea agreement.
While living in the United States, Arg-uelles worked as a pest control technician. He later started a small business exporting small electronics to Venezuela, which was his full time job at the time of the conspiracy.
In the 1980’s the United States sold F-16 airplanes to Venezuela. From 1991 to 1996 Arguelles attended the Air Force *699 Academy. Arguelles had known Pichardo since the military academy.
According to Arguelles, Lezama, also a retired Venezuelan Air Force officer who Arguelles knew before entering the academy, contacted Arguelles in September 2009. Lezama wanted to purchase F-16 parts. Arguelles admitted that he contacted Pichardo to put Lezama in touch with Pichardo. Arguelles claimed that he was not a party to the transaction and was not supposed to receive anything and that he attended the subsequent meetings because Lezama needed a ride.
Arguelles also discussed the nature of the 2002 protest in Venezuela, which was peaceful. Arguelles and others in the armed forces protested the Chavez government. Three demonstrators were executed. Others were imprisoned. The rest fled the country. Arguelles testified that at least one imprisoned person was tortured. Arguelles was not arrested, beaten, or imprisoned during or after the protest.
Almost two years after the protest (February 2004), Arguelles received a subpoena from the prosecutor in Venezuela. Arg-uelles believed that if he appeared he would be immediately imprisoned, tortured, and maybe killed. Arguelles testified that his 2002 protest and 2004 arrest warrant would still be relevant today, despite Chavez’s death. The current President, Maduro, who took power in 2013, was mentored by Chavez, served as Chavez’s vice president, and was Chavez’s hand-picked successor.
Arguelles claimed that after his criminal case in the United States, President Chavez spoke on national television in Venezuela about him and called him a traitor and the state-sponsored television showed his picture and did the same thing. Arg-uelles has never had any contact with any official of Maduro’s government.[3]
B. Dr. Bagley
Arguelles also presented the expert testimony of Dr. Bruce Bagley, who has a Ph.D. in Political Science and is the Chair of the Department of International Studies as the University of Miami. Dr. Bagley described the Venezuelan government as “increasingly authoritarian.” Dr. Bagley agreed with the State Department’s 2013 Venezuela Human Rights Report that Venezuela’s judicial system is politicized and used by the government as a means of political persecution. In Venezuela’s prisons, cruel and unjust punishment is “the theme of the day.” Dr. Bagley opined that “being thrown into that [prison] system really is life threatening, particularly for people who are known to be opponents of the government.” Dr. Bagley also opined that because Arguelles received a 2004 subpoena from a civilian authority, rather than a military tribunal, he “was going to be railroaded” and “set up.” Dr. Bagley testified that if Arguelles had appeared for his 2004 subpoena, Arguelles “would have been subjected to very harsh and cruel conditions” and “potentially his life would have been placed in danger.”
Dr. Bagley explained that “[a]nybody who is connected with dissent, even legal constitutional democratic dissent, is an object of suspicion, particularly by this successor to Chavez” because the “levels of paranoia, the levels of suspicion within the Venezuelan government with regard to the military are extremely high.” “Under these circumstances,” Dr. Bagley believed that if Arguelles returned to Venezuela, as a person “associated with dissident movements *700 within the Venezuelan military, especially the suspect air force,” Arguelles “would be subjected ... to harsh and abusive treatment, probably torture.” Dr. Bagley continued to say that the Venezuelan government “could easily end his life because they are seeking to send a message to everybody in the Venezuelan military, retired, or[ ] currently active, that it is not acceptable to express any form of dissent with regard to the government ... under current circumstances.”
Dr. Bagley explained that Arguelles would be placed in a similar position to that of Captain Nieto,[4] a military dissident who was tortured. Venezuela’s security services would remember Arguelles because they have long memories, keep extensive files, are intently focused on military dissidents, and still have a subpoena out for him.
C. Two Venezuelan Refugees
Arguelles also called two Venezuelan refugees who are now American citizens. Pedro Pereira was a general in the Venezuelan Air Force and entered the United States in 2008 as a refugee. Pedro Flores was a captain in the national guard in Venezuela. Both participated in the Altamira Square protests in 2002, and Flores knew Arguelles there. Both received a subpoena from the prosecutor back then and did not appear. According to Flores, if Arguelles were to return to Venezuela, he would be incarcerated and then word from people who work with the government would be sent out to have him killed as happened with a Colonel Deolindo Corde-ro.[5]
III. IJ DECISION
On February 11, 2015, the IJ issued a 78-page written decision, denying Arg-uelles’s applications for relief and ordering him removed to Venezuela. Having previously found that Arguelles was removable by engaging in activity to violate American exports laws, the IJ determined whether Arguelles was eligible for the relief of adjustment of status, waiver, asylum, withholding of removal, or CAT protection.
A. Ineligible for Adjustment of Status
As to the application for adjustment of status, the IJ found that Arguelles was inadmissible.
The IJ concluded that Arguelles had “been convicted of an act which constitutes the essential elepients of a crime involving moral turpitude,” rendering him inadmissible under 8 U.S.C. § 1182(a)(2)(A)(i)(I). The IJ applied the categorical approach to Arguelles’s conviction and reasoned that “exporting or importing defense articles on the United States Munitions list without obtaining the required license or approval is conduct that endangers others by its very nature without requiring that a person act with the intent to harm a specific person.” The IJ concluded that Arguelles’s conviction constituted the essential elements of a crime involving moral turpitude.
The IJ also found that Arguelles returned from a trip abroad on October 26, 2009 during the time of the conspiracy and, at that time, entered the United *701 States with the purpose of engaging in activity violating laws prohibiting the export of goods, technology, or sensitive information. The IJ concluded that Arguelles was also inadmissible pursuant to 8 U.S.C. § 1182(a)(3)(A)(i)(II), which renders inadmissible any alien who enters the United States to engage in any activity to violate U.S. export laws. 8 U.S.C. § 1182(a)(3)(A)(i)(II).
B. Waiver of Inadmissibility
The IJ also concluded Arguelles did not warrant a waiver of inadmissibility. The IJ denied Arguelles’s waiver of inadmissibility because a waiver, pursuant to INA § 212(h), 8 U.S.C. § 1182(h), is not available for a ground of inadmissibility under INA § 212(a)(3)(A)®, 8 U.S.C. § 1182(a)(3)(A)®.[6] Even if he were eligible, the IJ further concluded that, while Arguelles’s family has faced hardship during his incarceration, including financial difficulty, their situation did not rise to the level of extreme hardship that would support a waiver.
C. Exercise of Discretion
As an alternative, independent reason, the IJ found that Arguelles’s application for adjustment of status .did not warrant a favorable exercise of discretion because the seriousness of his criminal offense and his reluctance to admit any significant role in the meetings outweighed the other positive factors in his favor. The IJ focused on the seriousness of the conviction, including the fact that Arguelles contacted Pichardo, on Lezama’s behalf, because Arguelles believed Pichardo could help Lezama obtain airplane parts.
The IJ also considered positive factors in Arguelles’s favor. Arguelles has a wife, children, and other family members who are American citizens. Arguelles had a good relationship with his family. Arg-uelles was employed and operated two businesses. ■
The I J, however, concluded that the seriousness of Arguelles’s offense could only be overcome by “unusual or outstanding equities,” which Arguelles had not shown. The IJ found Arguelles’s reluctance to admit the extent of his participation “troubling.” Arguelles did not leave the meeting or contact the authorities after hearing the words “black market” for F-16 parts. Arg-uelles admitted he knew the F-16 parts could not be sent from the United States to Venezuela. Arguelles was a critical member of the conspiracy because he knew how to contact Pichardo, knew Pi-chardo could help, and connected Lezama with Pichardo.
The IJ determined that the items at issue, even if they were not firearms or ammunition, could “render assistance to a military force of another country” and “have the potential to support that country in the infliction of harm, potentially against the United States.” The IJ acknowledged the country conditions evidence. Additionally, when Arguelles applied for naturalization in 2010, he checked the box' indicating that he had not been involved in criminal activity even though the events supporting his conviction began in 2009.
For the foregoing reasons, the IJ declined, as a matter of discretion, to grant an adjustment of status.
D.Asylum & Withholding of Removal
The IJ also found that Arguelles was not eligible for asylum or withholding of removal because he was convicted of a particularly serious crime. The IJ found that (1) Arguelles’s conspiring to commit an offense against the United States brought *702 a conviction “within the ambit of a particularly serious crime,” and (2) the other pertinent evidence, including the criminal information and the stipulated factual basis, demonstrated that Arguelles was convicted of a particularly serious crime.
E. Convention against Torture
The IJ also determined that Arguelles did not qualify for deferral of removal under CAT because he had not met his burden to show that it' was more likely than not that he would be tortured upon his return to Venezuela. Arguelles also had not shown that he was tortured in the past.
The IJ mentioned that a cousin of Arg-uelles is still in the Venezuelan Air Force and lives in Venezuela, along with other relatives. The IJ pointed out that Dr. Bag-ley testified that the Venezuelan government is not totalitarian, in the sense that “it does not have the ability to oversee and control everything that occurs within the country.”
The IJ recognized that the State Department’s 2013 Human Rights Report “depicts a country plagued by serious issues,” including “summary killings by police elements, torture and other cruel, inhumane, or degrading treatment,” as well as “life-threatening prison conditions, ... deaths in prison, arbitrary arrests and detentions, corruption and impunity in police forces, political prisoners and corruption at all levels of the government.” Nonetheless, the IJ concluded that simply showing a pattern of human rights violations was insufficient, as the burden was on Arguelles to demonstrate that he personally was at risk of torture, which he failed to do. The IJ concluded that, in any event, Arguelles had not demonstrated that such torture would be by, or with, the consent or acquiescence of, a public official
The IJ explained that Arguelles had not shown that he himself more than likely would be subjected to torture if returned to Venezuela in 2015. The IJ discussed the 2013 Human Rights Report but found that there was evidence that the Venezuelan government was “taking steps to combat any such abuses” and there was “some indication” .that the government was working to improve the prison system. The IJ recognized that in 2014 there was “a rash of protests” leading to violence in the streets, the deaths of protestors and security forces, and arrests of protestors, including opposition leader Leopoldo Lopez. The IJ found that those 2014 protests were “largely led by students” and Arg-uelles was not involved.
According to the IJ, Arguelles’s “primary fear ... is that he will be imprisoned ... and that, in prison, he will be subjected to torture.” The IJ concluded that Arg-uelles had “not demonstrated that there are specific grounds that exist that indicate he would be personally at risk for torture were he to be imprisoned.” The IJ found that Dr. Bagley did not testify that participants in the 2002 protests “are specifically sought out for torture or are subjected to harm greater than what any prisoner in Venezuela experiences.”
The IJ found that there was “no indication in the record that a participant in the 2002 protests in the Plaza of Altamira who returns to Venezuela 13 years after the protests, will more likely than not be tortured.” The IJ also noted that Arguelles remained in Venezuela until 2004 and does not claim to have been harmed while in Venezuela from 2002 to 2004.
The IJ distinguished the example of opposition leader Leopoldo Lopez because Lopez participated, not just in the 2002 Altamira protests, but also in a 2002 military coup and the 2014 student protests. We note that, similarly, Captain Nieto, to whom Dr. Bagley compared Arguelles, was *703 involved in a 2014 plot against the Venezuelan government. The IJ also distinguished a report of an army member who participated in the 2002 protests and “was detained and supposedly electrocuted” because that incident occurred while Chavez was president, while Maduro is now president.
The IJ found that Arguelles’s “fear of returning to Venezuela appears to be genuine” but that he participated in a conspiracy to export items on the Munitions List to Venezuela’s armed forces. The IJ concluded that “there is no indication in the record that participants in the 2002 protest are currently being targeted by the judicial system based upon their participation in that 2002 protest and subjected to torture as a result of such prosecution.”
Arguelles appealed through counsel to the BIA,
IV. PROCEEDINGS BEFORE THE BIA
A. Initial Appeal
On July 23, 2015, the BIA dismissed Arguelles’s appeal. As to removability, the BIA decided that the IJ “properly found that” Arguelles was removable under 8 U.S.C. § 1227(a)(4)(A)®. The BIA reasoned that Arguelles pleaded guilty to conspiracy to violate the AECA and that any “activity to violate any law” included a conspiracy.
As to Arguelles’s application for relief from removal, the BIA found find it unnecessary to decide (1) whether Arguelles’s crime is one of moral turpitude; (2) whether Arguelles is inadmissible; or (3) whether extreme hardship existed in relation to his waiver of inadmissibility. Instead, the BIA agreed with the IJ’s exercise of discretion analysis.
In that regard, the BIA agreed with the government and the IJ that the negative equity of Arguelles’s conviction, in which he attempted to provide items that “render assistance to a foreign military” and “have the potential to support that country in the inflict of harm, including against the United States,” outweighed Arguelles’s positive equities, which included his family ties, history of gainful employment, financial and emotional support to his family, and the worrisome conditions in Venezuela. The BIA agreed that Arguelles was convicted of a particularly serious crime that rendered him ineligible for asylum and withholding of removal, as the evidence indicated that (1) he “knowingly and willfully conspired to export” defense articles on the Munitions List without State Department approval; (2) he met with several individuals to discuss the sale of aircraft parts requested by the Venezuelan Air Force, knowing that the airplane parts could not be sent legally from the United States to Venezuela; and (3) his conduct “was harmful to the security and foreign policy interests of the United States.”
As to CAT relief, the BIA agreed with the IJ’s finding that the record evidence was insufficient to demonstrate that Arg-uelles himself more likely than not will be tortured by government officials upon his return. Notably, the BIA found that there was insufficient evidence to show that torture is used in Venezuelan prisons as a matter of policy or is widespread and pervasive, and Arguelles had not established that a participant in the 2002 protests who returns thirteen years later will more likely than not be tortured.
The BIA agreed with the IJ that Arg-uelles’s “evidence indicates isolated incidents of torture and does not demonstrate that the respondent would be individually singled out.” The BIA concluded that Arg-uelles “did not establish that it is more likely than not that he would be tortured at the instigation of, or with the consent or *704 acquiescence of, the Venezuelan government.” The BIA agreed that any claim that government officials would harm Arguelles upon his return was speculative and not supported by the record.
B. Motion to Reopen
On October 21, 2015, Arguelles filed a timely Motion to Reopen with the BIA. Arguelles claimed that on October 19, 2015, his family discovered politically-motivated criminal charges against him in Venezuela from 2009. They obtained Arg-uelles’s entire record, which included a 2009 arrest warrant of which they previously were unaware.
The 2009 arrest warrant listed the “Type of Crime” as “No Crime Indicated.” The 2004 arrest warranted listed the crime as “Treachery Conspiracy Against Allied Nation.” A government official told Arg-uelles’s family that Arguelles would be detained immediately upon landing in Venezuela. Arguelles contended that his newly discovered arrest warrant significantly strengthened his claim for CAT protection because it supplements the other evidence in the record that he will more likely than not be tortured.
C. BIA’s Denial of the Motion to Reopen
On December 7, 2015, the BIA denied Arguelles’s Motion to Reopen. First, the BIA found that the motion did not provide an adequate explanation for why Arg-uelles’s family did not obtain the 2009 warrant earlier. Second, the BIA concluded that the new arrest warrant with “no crime indicated” was limited evidence that was unlikely to change the result of the case with respect to his application for CAT protection.
D.Arguelles’s Removal
After the BIA ruled on December 7, the Attorney General had Arguelles removed to Venezuela on December 22, 2015. Upon his arrival, Venezuelan officers arrested Arguelles, and he remains in prison.
V. STANDARD OF REVIEW
As a threshold matter, we note that we lack jurisdiction to review the discretionary decision to deny Arguelles’s application for adjustment of status. See 8 U.S.C. § 1252(a)(2)(B)(i). However, we retain jurisdiction to review colorable constitutional claims and questions of law, such as statutory eligibility for discretionary relief. See 8 U.S.C. § 1252(a)(2)(D); Alvarado v. U.S. Att’y Gen., 610 F.3d 1311, 1314 (11th Cir. 2010).
Generally, we review only the BIA’s decision, except to the extent the BIA adopted the IJ’s opinion. Kazemzadeh v. U.S. Att’y Gen., 577 F.3d 1341, 1350 (11th Cir. 2009). We review findings of fact, including findings of removability, for substantial evidence. Adefemi v. Ashcroft, 386 F,3d 1022, 1026-27 (11th Cir. 2004). We review legal issues de novo. Zheng v. U.S. Att’y Gen., 451 F.3d 1287, 1289 (11th Cir. 2006).
VI. REMOVABILITY
Section § 1227 provides, in relevant part: “Any alien who has engaged ... in ... any activity to evade any law prohibiting the export from the United States of goods, technology, or sensitive information ... is deportable.” 8 U.S.C. § 1227(a)(4)(A). The Court agrees with the Attorney General that § 1227(a)(4)(A) does not require a criminal conviction for an individual to be deportable. Instead, the person merely needs to have “engaged” in *705 “any activity” that violates “any law prohibiting the export ... of goods.”[7]
The stipulation of facts accompanying Arguelles’s guilty plea and Arguelles’s own testimony establish the fact that Arguelles engaged in such activity. Arguelles admitted that he participated in a conspiracy to violate the AECA, which is a law prohibiting the export of goods without a license. Arguelles also admitted that he conspired to procure and supply to the Venezuelan Air Force defense articles designated on the Munitions List without a license or' approval to make those sales. He connected Lezama to Pichardo. He attended three meetings with these men and Klokke. “Black market” items were discussed. And, Arguelles knew the items they discussed could not be exported from the United States without the proper licensing. The IJ and BIA thus did not err in concluding that Arguelles was removable under § 1227(a)(4)(A).
VII. ADJUSTMENT OF STATUS AND THE EXERCISE OF DISCRETION
The status of an alien may be adjusted, at the “discretion” of the Attorney General, to that of a legal permanent resident “if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible [8] to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.” 8 U.S.C. § 1255(a) (footnote added). Even if the three prerequisites are met, the Attorney General has discretionary authority to deny adjustment of status. Usmani v. U.S. Att’y Gen., 483 F.3d 1147,1150-51 (11th Cir. 2007).
“ [Applications for adjustment must of necessity be resolved on an individual basis.” In re Arai, 13 I. & N. Dec. 494, 495-96 (B.I.A. 1970). An alien seeking adjustment of status “has the burden of establishing that the requested relief should be granted in the exercise of discretion.” In re Blas, 15 I. & N. Dec. 626, 629 (B.I.A. 1974). As noted above, the Court does not have jurisdiction to review the discretionary decision but can review questions of law. Alvarado, 610 F.3d at 1314. Here, we cannot say that Arguelles has shown that the BIA committed any legal error in denying his request for discretionary relief. The BIA properly reviewed the IJ’s weighing of the favorable and adverse factors and concluded the IJ properly denied Arg-uelles’s application for adjustment of status. See In re Arai, 13 I. & N. Dec. at 496 (indicating that it is necessary to weigh the adverse factors against the favorable ones). Arguelles has not demonstrated any legal or constitutional error as to that denial.[9]
*706 VIII. ASYLUM AND WITHHOLDING OF REMOVAL
An alien is ineligible for asylum under 8 U.S.C. § 1158, if “the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States.” 8 U.S.C. § 1158(b)(2)(A)(ii). Section 1158 also provides that an aggravated felony shall be considered a particularly serious crime but permits the Attorney General to “designate by regulation offenses that will be considered to be a” particularly serious crime. 8 U.S.C. § 1158(b)(2)(B)(i)-(ii).
Similarly, an alien, who otherwise would not be removed because thé alien’s life or freedom would be threatened because of the alien’s political opinion, is ineligible for such withholding if “the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States.” 8 U.S.C. § 1231(b)(3)(B)(ii). Section 1231 further provides:
For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.
8 U.S.C.. § 1231(b)(3)(B).
Arguelles contends that, based on a comparison of § 1158 and § 1231, for a conviction to constitute a particularly serious crime to bar an applicant for withholding of removál under § 1231, the conviction must be for an aggravated felony.
This Court has read § 1231(b)(3)(B) to give the Attorney General discretion to determine the existence of a particularly serious crime except when the conviction is for an aggravated felony with a sentence of imprisonment of five years or more. Cole v. U.S. Att’y Gen., 712 F.3d 517, 530 (11th Cir. 2013) (“Simply stated, this subsection gives the Attorney General discretion to deny withholding of removal to otherwise qualified aliens if they have committed what the Attorney General deems to be a particularly serious crime. When, however, an alien has committed an aggravated felony or felonies, and the aggregate term of imprisonment is five years or more, the Attorney General has no discretion, and the statute automatically bars the alien from withholding of removal.”).
The BIA also interprets § 1231(b)(3)(B) as giving the Attorney General discretion, allowing “that a particularly serious crime need not be an aggravated felony.” In re N-A-M, 24 I. & N. Dec. 336, 337 (B.I.A. 2007). This Court has cited In re N-A-M with approval in a case where the IJ determined whether a non-aggravated felony constituted a particularly serious crime. See Lapaix v. U.S. Att’y Gen., 605 F.3d *707 1138, 1143 (11th Cir. 2010) (“When the offense in question is not a per se particularly serious crime, the Attorney General retains discretion to determine on a casé-by-case basis whether the offense constituted a particularly serious crime.” (citing In re N-A-M, 24 I. & N. Dec. at 338)).
Given Lapaix, Cole, and In re N-A-M, we must conclude that the BIA did not err in concluding that Arguelles’s crime could be a particularly serious crime without being an aggravated felony.
Alternatively, Arguelles argues that the BIA erred in concluding his crime actually was a particularly serious crime. We disagree because the BIA fully considered the facts, circumstances, and nature of Arguelles’s conviction. First, the BIA expressly addressed the nature of Arg-uelles’s conviction, a conspiracy, and noted that § 1182(a)(3)(A)(i)’s “any activity to violate any law” language includes a conspiracy. Second, the BIA considered Arg-uelles’s testimony concerning the extent of his 'involvement with the conspiracy and his culpability. The BIA, however, agreed with' the IJ that it. was “troubling” that Arguelles “was reluctant to admit” the extent of his participation. The BIA also noted that Arguelles did not leave the meetings or attempt to alert the authorities. Third, the IJ and the BIA looked[1] at the particular facts and noted that Arg-uelles admitted that he knew the items could not be exported legally from the United States. The IJ was free to rely on the stipulated facts to which Arguelles and his attorney agreed.
The IJ and the BIA also properly took into account the elements of Arguelles’s office, including the fact that the items Arguelles admitted to conspiring to sell were listed on the Munitions List. The BIA, and the IJ, reasonably concluded that the attempted sale of items on that list, even airplane parts and engines, was a particularly serious crime.
To affirm the BIA’s decision, this Court need not decide whether the BIA and IJ made the best possible decision. Indeed, the Court need not even agree with their decisions, as long as those decisions were reasonable. The Court concludes that they were. The evidence in the record, while often favorable to Arguelles, does not compel a reversal of the IJ’s fact findings in this regard.
IX. CAT RELIEF
Arguelles contends that the BIA ■erred in denying him deferral of removal under CAT. “The burden of proof is on the applicant for withholding of removal under [CAT] to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal,” 8 C.F.R. § 208.16(c)(2). The BIA found, as did the IJ, that Arguelles had not demonstrated that it was more likely than not that he personally would be singled out for torture upon his return.[10]
This Court reviews the IJ’s factual determinations using the substantial evidence test. Carrizo v. U.S. Att’y Gen., 652 F.3d 1326, 1330 (11th Cir. 2011). “To reverse the'BIA’s fact findings, this Court must find that the record not only supports reversal, but compels it.” Rodriguez Morales v. U.S. Att’y Gen., 488 F.3d 884, 890 (11th Cir. 2007) (alterations and quotation marks omitted).
The evidence in the record is insufficient to compel this Court to find that it is more likely than not that the Venezuelan gov- *708 erran en t would torture Arguelles after his reten to Venezuela. Arguelles argued before the BIA, as well as on appeal now, that, because of the conditions of Venezuela’s prisons, the prisons themselves are a “calculated tool of torture in Venezuela” and thus when a person is targeted and placed in prison, in violation of their constitutional rights, they have been singled out for torture. Upon his removal to Venezuela, Arguelles was arrested and imprisoned.
The country condition evidence shows that Venezuela suffers from significant human rights violations, including political violence and harsh and life-threatening prison conditions. That pattern of behavior, however, does not, by itself, suffice to show that Arguelles in particular would likely be tortured in prison. The Human Rights Report indicates that some incidences of torture have occurred in Venezuelan prisons, but Arguelles must demonstrate beyond those general conditions that he will individually be singled out for torture. See Jean-Pierre v. U.S. Att’y Gen., 500 F.3d 1315, 1324 (11th Cir. 2007) (holding that the petitioner must “establish that they would be individually and intentionally singled out for harsh treatment”).
Arguelles pointed to evidence that he claims shows people similarly situated to him were tortured. The IJ considered this evidence and determined that those people were not similarly situated to Arguelles. The record does not compel a contrary conclusion. Captain Nieto and the three Venezuelan Air Force generals arrested in 2014, for instance, were accused of being involved in coup attempts. Arguelles has not been accused of being involved in a coup and instead was involved in peaceful protests in 2002. Arguelles also points to the example of Leopoldo Lopez. Lopez was arrested for his involvement in the 2002 Altamira protests but was released and then arrested again in 2014 for participation in protests in 2014 and not for his actions twelve years prior.
Arguelles also stresses that other people involved in the 2002 protests were tortured following those protects. Those actions, however, occurred over a decade ago and closer to the time of the protests. Furthermore, Arguelles lived in Venezuela without suffering harm for two years after the protests.
The IJ also considered Dr. Bagley’s testimony that the Venezuelan government resorts to torture and that torture occurs in Venezuelan prisons. But Dr. Bagley’s testimony is general in nature and does not compel the conclusion that Arguelles would more likely than not be singled out for torture.
While Arguelles’s evidence shows serious and troubling conditions in Venezuela, including some instances of torture, his evidence does not compel the conclusion that Arguelles met his burden to show that, more likely than not, he will be singled out for torture. See Cadet v. Bulger, 377 F.3d 1173, 1195 (11th Cir. 2004) (noting that the alien had the “burden to show that he more likely than not would be tortured if returned” and had failed to do so). At worst the evidence suggests that Arguelles will be arrested, detained, and kept in harsh conditions. See id. (“CAT does not require deferral of removal when a deportee may, or even will more likely than not, be subjected to cruel, degrading or inhuman treatment upon removal.”). Arguelles’s evidence also did not show that he will be treated more harshly than any other prisoner in Venezuela or that this harsh treatment rises to the level of torture. Because there is minimal particularized evidence showing Arguelles would be singled out for torture, this is not the rare case where the record compels this Court *709 to reach a different conclusion than the IJ and BIA.
X. OCTOBER 2015 MOTION TO REOPEN
An alien’s motion to reopen “shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material.” 8 U.S.C. § 1229a(c)(7)(B). “A motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing.” 8 C.F.R. § 1003.2(c)(1). We review the BIA’s denial of a motion to reopen for an abuse of discretion. Chacku v. U.S. Att’y Gen., 555 F.3d 1281, 1286 (11th Cir. 2008). “This review is limited to- determining whether the BIA exercised its discretion in an arbitrary or capricious manner.” Zhang v. U.S. Att’y Gen., 572 F.3d 1316, 1319 (11th Cir. 2009).
We cannot say the BIA acted arbitrarily or capriciously in denying Arguelles’s Motion to Reopen. The new country condition evidence did not substantially add to the previous country condition evidence. The BIA thus did not abuse its discretion in concluding that the new country condition evidence would have altered the outcome.
While the 2009 arrest warrant was new evidence, that evidence would not satisfy Arguelles’s “heavy burden” of demonstrating that it would likely change the outcome of his application for deferral of removal under CAT. At best the 2009 arrest warrant shows that the Chavez government was still interested in Arguelles five years after the 2004 arrest warrant and that they are likely to arrest him upon his arrival in Venezuela, which is exactly what they did. The problem for Arguelles though is that the 2009 arrest warrant does not indicate that the conditions of his confinement amount to torture or that he will otherwise be targeted out for torture. The BIA did not abuse its discretion or err in concluding that this additional arrest warrant, by itself, was insufficient to change the outcome of the case. For the foregoing reasons, we cannot say that the BIA erred in denying the Motion to Reopen.
XI. MOTION TO STRIKE
The government continues to advance its “Motion to Strike Portions of Petitioner’s March 28, 2016 Reply Brief and Addendum to the Reply.” The relevant portion is Exhibit D to Arguelles’s Reply brief, which is extra-record evidence about events taking place after Arguelles’s removal to Venezuela.
Exhibit D contains (1) a Judicial Notice of Incarceration, indicating Arguelles had been subject to “preventative deprivation of liberty” “for committing crimes of Conspiracy” and (2) a letter from Arguelles’s Venezuelan attorney discussing the status of his imprisonment. According to the letter, Arguelles was detained when he landed in Venezuela, and he now sleeps in a small cell in the basement of the Military Contra Intelligence Division in Boleita, Caracas. There are no windows or natural light. He does not have a watch or clock. He cannot speak to his legal team in private, and they can only talk to him through a phone cabin up to an hour per week. Arguelles is allowed outside only one hour each week and now has a rash. His allergies and breathing problems are exacerbated by the poor ventilation. There are neither recreational activities nor potable water. Instead, his family brings water when they visit at which time they are subjected to complete strip searches. And, Arguelles’s “case has been plagued by irregularities since the beginning.”
*710 While these conditions of imprisonment are patently harsh, they do not rise to the level of torture which is required for CAT relief. Accordingly, we deny the government’s motion to strike as moot,
XII. CONCLUSION
For the foregoing reasons, we must deny Arguelles’s petitions for review, affirm the BIA’s final order, and affirm the denial of reopening. We deny the motion to strike as moot.
To be clear, all we say here is that based on the record before us, we are not compelled to conclude that Arguelles’s imprisonment rises to the level of torture. Nothing herein should be read as precluding Arguelles from continuing to press his case with the Attorney General. If Arguelles presents additional evidence at a later date, we note that both the BIA sua sponte, and the Attorney General for that matter, can reopen and reconsider Arg-uelles’s case. Nothing in this opinion should be read as restricting whatever authority they have. Finally, we note that the Attorney General conceded at oral argument that if Arguelles somehow won his release from detention in Venezuela and made it to the United States he could seek asylum and apply again for CAT protection. But such a remedy is quite unlikely to provide any relief to Arguelles any time soon. Thus, we emphasize again that nothing in this opinion should be read to foreclose or limit a claim by Arguelles for asylum, which the Attorney General stated at oral argument has a much lower standard for relief.
AFFIRMED.

. The stipulated factual basis refers to this individual as “S-l” and does not identify S-l as a government informant, although the government now admits that it refers to Klokke.

. "K.L.” being Karin Lezama.

. Arguelles’s wife testified that she was an attorney in Venezuela, helped the military members of the Altamira Square protests, and was identified as part of the opposition. She believed that, if Arguelles were deported to Venezuela, he would be killed.

. Arguelles submitted a newspaper article that explains that Captain Juan Carlos Nieto was alleged to be part of a plot against the Venezuelan government in 2014 and when Nieto returned from a visit to the United States he was arrested and "savagely tortured by military intelligence.”

. The judgment in Arguelles’s criminal case and the conviction documents are in the record. The IJ also admitted into evidence various exhibits submitted by Arguelles.

. The IJ found that Arguelles was not convicted of a violent or dangerous crime.

. Arguelles argues that this Court must apply the categorical approach to determine whether his conviction qualifies under § 1227(a)(4)(A). As noted above, a conviction is not a required element of removal under that section. The issue here is whether Arg-uelles committed the prohibited actions, not whether he was convicted of them. Even though Arguelles’s testimony attempted to mitigate his actions, there was still enough evidence for the IJ and BIA to find him removable under § 1227(a)(4)(A).

. Section 1182 provides that "any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of ... a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime ... is inadmissible.” 8 U.S.C. § 1182(a)(2)(A). The IJ concluded that Arguelles’s conviction was for a crime of moral turpitude, but the BIA did not address the issue as it relied on a negative exercise of discretion finding.

.We must reject Arguelles’s claim.that the BIA violated his due process rights in its exercise of discretion with respect to his ap *706 plication'for adjustment of status. "[T]he Fifth Amendment entitles aliens to due process of law in deportation proceedings,” Reno v. Flores, 507 U.S. 292, 306, 113 S.Ct 1439, 1449, 123 L.Ed.2d 1 (1993). Accordingly, aliens must receive “notice and opportunity to be heard in their removal proceedings.” Fernandez-Bernal v. Att’y Gen. of the U.S., 257 F.3d 1304, 1310 n.8 (11th Cir. 2001). Arguelles, however, "cannot prevail on his due process claim because he has no constitutionally protected interest in purely discretionary forms of relief.” Scheerer v. U.S. Att’y Gen., 513 F.3d 1244, 1253 (11th Cir. 2008). "Adjustment of an alien’s status .. is a discretionary form of relief.” IcL Arguelles thus has no constitutionally protected interest in his adjustment of status.

. The government has argued that Arg-uelles’s CAT claims, among others, are moot because of his removal to Venezuela. The government has now withdrawn its mootness argument and focuses its argument on the merits of the CAT claim.

. The government made many discretionary decisions regarding Mr. Arguelles, each of which could have prevented his current predicament. The BIA exercised its discretion to deny Mr. Arguelles’s application for adjustment of status. The government also rendered Mr. Arguelles ineligible for asylum based on its discretionary decision that Mr. Arguelles’s crime was "particularly serious." This was despite his comparatively short twenty-three month sentence based on evidence that he set up and attended three meetings about selling airplane parts to Venezuela. The government then exercised its discretion to remove Mr. Arguelles before his appeal was decided. Now, the government continues to exercise its discretion by not reopening Mr. Arguelles’s case to consider new evidence.